## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

**UNITED STATES OF AMERICA**

**v.**                                                    **Cr. No. H-21-440**

**JUAN ANTONIO HERNANDEZ-LOPEZ**

### DEFENDANT'S OPPOSED MOTION TO DISMISS
### BASED ON RACIALLY DISCRIMINATORY STATUTE

Juan Antonio Hernandez-Lopez asks this Court to dismiss his case because he is charged with a violation of a statute, 8 U.S.C. § 1326, that violates the equal protection guarantee of the Fifth Amendment.

## I.    Introduction

In April 2020, the Supreme Court relied on historical evidence of a state legislature's racial motives to strike down a criminal law enacted a century earlier. *See Ramos v. Louisiana*, 140 S. Ct. 1390 (2020). Although the law was later reenacted with no evidence of animus, the Court refused to ignore the "racially discriminatory *reasons* that [the state] adopted [its] peculiar rules in the first place." *Id.* at 1401 (emphasis in original). Even the justices' "shared respect for rational and civil discourse" could not "supply an excuse for leaving an uncomfortable past unexamined." *Id*. at 1401 n.44.

Like the law in *Ramos*, the law criminalizing illegal reentry into the United

States at 8 U.S.C. § 1326 has an "uncomfortable past" that must be examined. *Ramos*, 140 S. Ct. at 1408 n.44. Enacted at the height of the eugenics movement, the "Undesirable Aliens Act of 1929" was conceived, drafted, and enacted by white supremacists out of a belief that the "Mexican race"[1] would destroy the racial purity of the United States. Not only did this racism underlie the original version of § 1326, the law has disparately impacted Mexicans and other Latinx individuals in the century since.

Because the facts and historical evidence presented here show that the original illegal reentry law was enacted with a discriminatory purpose and still has a disparate impact, § 1326 is presumptively unconstitutional under *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977). The burden thus shifts to the government to show that Congress would have passed the law in the absence of any discriminatory purpose. *Hunter v. Underwood*, 471 U.S. 222, 228 (1985) (citation omitted). If the government cannot make this showing, the law is invalid, and the Court must dismiss Mr. Hernandez-Lopez's criminal charge.

A number of courts around the country have already confronted the question whether the illegal reentry statute has racially discriminatory origins that render it

---

[1] In the early 20th century, "Mexican" was conceptualized as a race rather than a nationality. For instance, the 1930 census listed "Mexican" as a "Color or Race." United States Census Bureau, *History: 1930*, https://www.census. gov/history/www/through_the_decades/index_of_questions/1930_1.html. And "[f]rom at least 1846 until as recently as 2001 courts throughout the United States have utilized the term 'Mexican race' to describe Latinos." Lupe S. Salinas, *Immigration and Language Rights: The Evolution of Private Racist Attitudes into American Public Law and Policy*, 7 Nev. L.J. 895, 913 (2007).

unconstitutional. After taking the testimony of two defense experts, Dr. Kelly Lytle Hernández, and Dr. Professor Benjamin Gonzalez O'Brien, at an evidentiary hearing,[2] the district court in Nevada held that both the original 1929 illegal reentry law and its successors had a discriminatory purpose that resulted in a disparate impact on Mexicans and other Latinx individuals. Accordingly, the court granted the motion to dismiss. *United States v. Carrillo-Lopez*, ___ F.Supp.3d ___, 2021 WL 3667330 (D. Nev. Aug. 18, 2021).

As detailed in *Carrillo-Lopez*, 2021 WL 3667330 at *18 nn.33-34, other district courts have denied such motions. *See, e.g. United States v. Machic-Xiap*, ___ F.Supp.3d ___, 2021 WL 3362738 (D. Or. Aug. 3, 2021) (denying motion to dismiss but granting sentence below the Guidelines); *United States v. Wence*, Case No. 3:20-cr-0027, 2021 WL 2463567 (D.V.I. Jun. 16, 2021); *United States v. Gutierrez-Barba*, Case No. CR-19-01224-001-PHX-DJH, 2021 WL 2138801 (D. Ariz. May 25, 2021). *See also United States v. Barcenas-Rumaldo*, No. 3:20-cr-01849-DB (W.D. TX. May 7, 2021).

For the reasons set forth below, Mr. Hernandez-Lopez respectfully requests this Court to follow the reasoning of *Carrillo-Lopez* and to dismiss the charges against him.

---

[2] The declaration and vita of Professor Hernandez is attached as Appendix A. The vita of Professor Gonzalez-O'Brien is attached as Appendix B. The hearing transcript is attached as Appendix C (hereinafter "Transcript")

## II.    Legal Framework

The Fifth Amendment to the United States Constitution provides that no person shall be "deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. This clause contains an implicit guarantee of equal protection in federal laws identical to what the Fourteenth Amendment guarantees in state laws. *See Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1686 n.1 (2017).

A law may violate equal protection in three ways. First, a law may discriminate on its face. *See*, *e.g.*, *Loving v. Virginia*, 388 U.S. 1 (1967). Second, authorities may apply a facially neutral law in a discriminatory way. *See*, *e.g.*, *Yick Wo v. Hopkins*, 118 U.S. 356 (1886). Third, a legislature may enact a facially neutral law with a discriminatory purpose, which disparately impacts a disfavored group. *See*, *e.g.*, *Arlington Heights*, 429 U.S. at 265–68.

Here, Mr. Hernandez-Lopez challenges § 1326 under the third rationale, so the legal framework of *Arlington Heights* applies. *Arlington Heights* clarified that the *effect* of a racially discriminatory law does not alone make it unconstitutional— challengers must also show "[p]roof of racially discriminatory *intent* or *purpose*" at the time of the law's passage. *Id*. at 265 (emphasis added). Determining whether a purpose was discriminatory requires "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Id*. at 266. *Arlington Heights* gave a non-exhaustive list of relevant factors to consider in this determination, including:

1)   the impact of the official action and whether it bears more heavily on one race than another;

2)   the historical background of the decision;

3)   the specific sequence of events leading to the challenged action;

4)   the [legislature's] departures from normal procedures or substantive conclusions; and

5)   the relevant legislative or administrative history.

*Id.* at 266–68.

The threshold for satisfying these factors is low. Since legislatures are rarely "motivated solely by a single concern," a challenger need not show that the legislature's actions "rested solely on racially discriminatory purposes." *Arlington Heights*, 429 U.S. at 265–66. Instead, the challenger need only show "proof that a discriminatory purpose has been a *motivating factor* in the decision." *Id.* at 265–66 (emphasis added).

Once the challenger shows that discriminatory purpose was a "motivating factor," the burden shifts to the law's defender to show that "the same decision would have resulted even had the impermissible purpose not been considered." *Arlington Heights*, 429 U.S. at 270 n.21. If the government cannot show that the legislature would have enacted the offending law in the "absence of the racially discriminatory motivation," the law violates the Fifth Amendment and must be invalidated. *Id.* at 225.

Courts have applied *Arlington Heights* to a variety of laws and government actions. One of the first involved a provision in the Alabama constitution that barred voting for any person convicted of a "crime involving moral turpitude." *Hunter*, 471

U.S. at 222. Though neutral on its face, the provision disenfranchised ten times as many Blacks as whites. *Id.* at 227. To prove discriminatory intent in its passage, challengers submitted transcripts of the 1901 Alabama constitutional convention where lawmakers had originally enacted the provision, as well as several historical studies and the testimony of two expert historians. *See id.* at 229. This evidence showed that "zeal for white supremacy ran rampant" at the 1901 convention and was a "motivating factor" underlying the voting provision. *Id.* at 229–31. And because the provision "would not have been adopted by the convention or ratified by the electorate in the absence of the racially discriminatory motivation," the Supreme Court held that it violated equal protection. *Id.* at 231. *See also Democratic Nat'l Comm. v. Hobbs*, 948 F.3d 989 (9th Cir. 2020) (en banc) (considering racially tinged videos made by Republican Party chairman in striking down state law criminalizing third-party ballot collection); *Arce v. Douglas*, 793 F.3d 968, 981 (9th Cir. 2015)(reversing summary judgment where legislators' statements concerning "racial warfare," and similar comments created material issue of fact in a challenge to an Arizona law shutting down a Mexican American Studies program in the Tucson school district)

These cases show that courts have used *Arlington Heights* for decades to invalidate facially neutral laws enacted with a discriminatory intent that have disparately impacted racial groups.[3] As Mr. Hernandez-Lopez will show, the same animus infected § 1326 to an equal (or even greater) degree.

---

[3] Courts apply strict scrutiny to the question of whether a law was "motivated by a racial purpose or object" under *Arlington Heights. See Hunt v. Cromartie*, 526 U.S. 541, 546 (1999) (quotations omitted).

### III.    Disparate Impact

There is no doubt that Section 1326 "bears more heavily on Mexican and Latinx individuals." *See Carrillo-Lopez*, 2021 WL 3667330 at *6. As the Nevada court noted, over 97% of the persons apprehended at the border in 2000 were of Mexican descent, 86% in 2005 and 87% in 2010. *Id*. at *5. (citing U.S. Border Patrol Nationwide Apprehensions by Citizenship and Sector, 2007-2019 (URL omitted)). Increasingly, the border crossers are Latinx individuals from Central America. And the number of prosecutions has soared—in the three years before the COVID-19 pandemic, the number of § 1326 cases has risen by nearly 40% to 22,077. *See* United States Sentencing Commission, *Quick Facts: Illegal Reentry Offenses*, Fiscal Year 2019, *available at*: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Illegal_ Reentry_FY19. pdf, making illegal reentry one of the most common federal felonies today.

But disparate impact is just one factor in the *Arlington Heights* analysis. As the district court recognized in *Carrillo-Lopez,* 2021 WL 3667330, the illegal reentry statutes were also motivated by racial animus towards Mexicans and Latinx individuals. *Id*. at *7.

### IV.    Congress enacted the original illegal reentry with a discriminatory purpose.

Before Section 1326 was enacted in 1952, Congress first criminalized

unlawful reentry in 1929 as part of the Undesirable Aliens Act ("the Act of 1929"). *See* Act of Mar. 4, 1929, Pub. L. No 70-1018, ch. 690, 70 Congress, 45 Stat. 1551 (1929). What we now know as the illegal reentry statute, codified at 8 U.S.C. § 1326, was enacted as part of the Immigration and Nationality Act of 1952 ("INA"), often referred to as The McCarran-Walter Act ("McCarran-Walter Act"). Section 1326 was subsequently amended in 1988, 1990, 1994 and 1996, always to increase its deterrent value. *See Carrillo-Lopez*, 2021 WL 3667330 at *4 n.11.

In *Carrillo-Lopez*, the government ultimately conceded that "discriminatory intent motivated the passage of the Act of 1929." 2021 WL3667330 at*7 & n.17. But the government argued that passage of the subsequent 1952 law removed the taint of discrimination. *Id*. at *9. Still the district court deemed it appropriate to consider "the specific sequence of events leading to the challenged action," in this case the earlier history of the 1929 legislation. *Id*. (citing *Arlington-Heights*, 429 U.S. at 265-68). Accordingly, Mr. Hernandez-Lopez similarly recounts a brief history of the 1929 Act here.

A close examination of the political context underlying the criminalization of illegal entry in 1929 reveals a disturbing truth: that racism and eugenics were not only a "motivating factor" in the legislature's passage of this law. *Arlington Heights*, 429 U.S. at 265. They were the *primary* factor.

### A.     The historical background of the decision.

In her sworn declaration and in her testimony at the evidentiary hearing in Nevada, Dr. Hernández provided the historical background for the illegal reentry statutes, stating that the "criminalization of unauthorized entry was a racially motivated act." *Carrillo-Lopez*, *supra*, at \*7 (quoting Hernandez declaration at 2). She explained that the Act of 1929 "came on the heels of the National Origins Act of 1924 which 'narrow[ed] the pathways of legal immigration' by reserving 96 percent of all quota slots for European immigrants." *Id.* (citing Hernandez declaration at 2). But the 1924 Act exempted immigrants from the Western Hemisphere, in part "due to pressures from American industry who relied on Mexican labor." *Id.* (citing Hernandez at 2). The nativists and proponents of eugenics were not satisfied with this exemption. *Id.*

As Professor Hernandez explained, "racial animus 'bec[am]e more intense' heading into the 1920's, a period referred to as the 'Tribal Twenties,' when nativism and eugenics became more widely accepted and began to impact Congressional immigration proposals." *Carrillo-Lopez*, *supra* at \*7 (citing Hernandez declaration at 5, Transcript at 27-28). Mexican immigration was the subject of repeated debates following passage of the National Origins Act and culminating in passage of the 1929 illegal reentry statute. *Carrillo-Lopez, supra*, at 7. Professor Hernandez also noted that this was a time of the development of the "Juan Crow regime," involving "racial subjugation" of Hispanics similar to what was happening in the American South. *Id.* (citing Transcript at 32). *See also* Transcript at 59.

**B.     The specific sequence of events leading to the challenged action.**

As noted above, the quotas created by the National Origins Act were skewed towards immigrants from Western Europe. But the Act did not set quotas on immigrants from countries in the Western Hemisphere. This was due to the influence of large agricultural businesses that relied heavily on labor from just over the border. *See* Transcript at 28-30. These agri-businesses pressured legislators from western states to vote against the law, forcing nativists in Congress to "choose between accepting a Mexican quota exemption or passing no immigration law at all." Appendix A (Hernández declaration, at 3).

So, despite passing the most sweeping immigration law in years, legislators were not happy. Legislators "proposed bill after bill" restricting Mexican immigration but none could survive opposition from southwestern growers. Appendix A (Hernández declaration at 5). To solve this problem, a group of key figures began to strategize a new type of immigration bill that would approach immigration from a criminal—rather than a civil—angle.

**C.     "The relevant legislative or administrative history."**

Then-Secretary of Labor James Davis, together with Senator Coleman Blease, developed a compromise—Congress would criminalize border crossing *after the fact*, rather than *prevent* it in the first place.[4] That way, they reasoned, authorities could expel Mexicans through a criminal prosecution after the growing season was

---

[4] Ian MacDougall, *Behind the Criminal Immigration Law: Eugenics and White Supremacy*, ProPublica (June 19, 2020), https://www.propublica.org/article/behind-the-criminal-immigration-law-eugenics-and-white-supremacy.

over, thereby avoiding resistance from businesses that depended on Mexican labor.[5] The southwest growers were in agreement—as one put it, "We, in California, would greatly prefer some set up in which our peak labor demands might be met and upon the completion of our harvest these laborers returned to their country." Appendix A (Hernández declaration at 7).

Secretary Davis and Senator Blease found two eager collaborators in the House of Representatives, both of whom were on the powerful Immigration and Naturalization Committee. Representative John C. Box from Texas had long characterized the goal of immigration law as "the protection of American racial stock from further degradation or change through mongrelization." Appendix D, Representative Box (TX). "Restriction of Mexican Immigration," *Congressional Record*, (Feb. 9, 1928) pp. H2817–18. In one speech at an immigration conference, Rep. Box had explained that

> [t]he Mexican peon is a mixture of Mediterranean-blooded Spanish peasant with low-grade Indians who did not fight to extinction but submitted and multiplied as serfs. Into that was fused much negro slave blood….The prevention of such mongrelization and the degradation it causes is one of the purposes of our [immigration] laws.

*Id*.

Box was joined by the influential Chairman of the House Immigration and Naturalization Committee, Representative Albert Johnson of Washington. Chairman Johnson—for whom the 1924 "Johnson-Reed" National Origins Act was named—was an "energetic and vehement racist and nativist."[6] He headed the Eugenics

---

[5] *Id.*
[6] Dennis Wepman, *Immigration: From the Founding of Virginia to the Closing of Ellis*

Research Association, a group that opposed interracial marriage and supported forced sterilizations.[7] He also proudly described his 1924 law as a "bulwark against 'a stream of alien blood, with all its inherited misconceptions respecting the relationships of the governing power to the governed.'"[8] Within two years of the 1924 Act, Chairman Johnson turned to legislation that would exclude people of Mexican descent.

Following the lead of these legislators, other lawmakers soon "turned to narratives of racial threat to justify restriction."[9] In 1928, for instance, Representative Robert A. Green of Florida delivered a radio speech (later read into the congressional record by Representative Lankford) that advocated for Western Hemisphere quotas. He asserted that countries south of the United States are "composed of mixture blood of White, Indian, and negro." Appendix E, Representative Lankford. "Across the Borders." *Congressional Record* (Feb. 3, 1928) p. H2462. Immigration from these countries, he believed, created a "very great penalty upon the society which assimilates," and put it at a disadvantage to countries that have "kept their blood white and purely Caucasian." Appendix E, at H2462.

Central to the debates on the immigration bills during the 1920's was the testimony of Dr. Harry H. Laughlin, the director of the Eugenics Record Office. Dr. Laughlin testified before Congress multiple times and produced four reports that discussed topics such as "race crossing," "mate selection," "fecundity," "racial composition," and the "individual quality of future population." Exhibit F, *The*

---

*Island*, p. 242–43 (2002).

[7] *Id.*

[8] Roger Daniels, *Guarding the Golden Door*, p. 55 (Hill and Wang, 2004).

[9] Gonzalez O'Brien, Chap. 1, *Handcuffs and Chain Link* (2018).

*Eugenical Aspects of Deportation: Hearings before the Committee on Immigration and Naturalization House of Representative*, 70th Cong. 70.1.4, pp. 2, 3 (1928). Early in the hearing, Chairman Johnson praised Dr. Laughlin's prior reports to Congress on race crossing, mate selection, and fecundity, describing one as a "priceless" resource that would "bear intimately on immigration policy." Appendix. F, at 3.

Dr. Laughlin testified about his latest eugenics report, the goal of which was to "protect American blood from alien contamination." Appendix F, at 3. The job of any government, Dr. Laughlin explained, was to "demand fit mating and high fertility from the classes who are better endowed physically, mentally, and morally by heredity." Appendix F, at 19. By deporting or excluding the "lower races" from the country, Dr. Laughlin contended, "[i]mmigration control is the greatest instrument which the Federal Government can use in promoting race conservation of the Nation." Appendix F, at 19.

In response, Chairman Johnson advocated for Congress's use of the "principle of applied eugenics" to "do everything possible" to reduce crime by "debarring and deporting" more people. Appendix F, at 25. Rep. Box agreed, stating, "we will have to control immigration to suit our own needs or we will lose our national character," which would "spell destruction for the future of America." Appendix F, at 25.

Dr. Laughlin even compared the drafters of deportation laws to "successful breeders of thoroughbred horses," who would never consider "acquiring a mare or a stallion not of the top level" for their "stud farm." Appendix F, at 44. One such successful breeder he knew "weeds out from the lower levels and recruits by purchase"—a process that is "analogous to immigration in man." Appendix F, at 44–

45. "Man is an animal," Dr. Laughlin explained, "and so far as heredity and future generations are concerned, there is considerable real basis for [this] comparison." Appendix F, at 45.

When such racial engineering is not possible, Dr. Laughlin warned, deportation of the "undesirable individual" becomes even more critical; otherwise, "we cannot get rid of his blood no matter how inferior it may be, because we cannot deport his offspring born here." Appendix F, at 45. Dr. Laughlin predicted that so long as the nation's borders remained open to immigrants, "there will always be need for deportation, or the 'final selection.'" Appendix F, at 44. In response to this testimony, Chairman Johnson agreed that "[i]mmigration looks more and more like a biological problem, and if the work of this committee results in establishing this principle in our immigration policy we will be well repaid for our efforts." Appendix F at 46.

These remarks of the eugenicist, Dr. Laughlin, and representatives such as Chairman Johnson became the foundation for the Act of 1929, which was quickly sent to the House after a compromise was brokered with the agricultural industry. Carrillo-Lopez, supra at *8 (citing Hernandez declaration at 9-10, 14). During debate on the bill in the House, representatives "made similar racist remarks." Carrillo-Lopez, supra, at *8. Representative Thomas L. Blanton complained that Mexicans "come into Texas by hordes" and that "my friend Judge Box has been making a just fight against this situation for years." Appendix G, Representative Blanton, "Deportation of Aliens." Congressional Record (1929) p. H3619. He urged the House to "apprehend the thousands of these Mexicans who are in Texas now unlawfully and put them back across the Rio Grande and keep them there." Id.

14

Representative Schafer added that "[t]hese Mexicans also come into Wisconsin in droves," and Representative Blanton challenged others to visit the international ports of entry in Texas to see the "hordes that come across the bridges with no intention of ever going back." *Id*. Representative Fitzgerald then added that from a "moral standpoint," Mexicans were "poisoning the American citizen" because they are "of a class" that is "very undesirable." *Id*. at p. H3620. *See also Carrillo-Lopez, supra*, at *8.

Both the House and the Senate reported that criminal penalties would provide assistance in the administration of the nation's immigration laws. See Appendix H, Sen. Rep. No. 70-1456 (1929); Appendix I, H.R. Rep. No. 70-2397 (1929). The bill became law on Mar. 4, 1929. Appendix J, 70th Cong., Sess. II, Chap. 690, Mar. 4, 1929.

This legislative history pertaining to the Act of 1929 easily clears the low threshold of showing that racism and eugenics were a "motivating factor" under the first three factors. Like other *Arlington Heights* cases, passage of the racially-motivated law followed a predictable pattern. A broad social movement founded on principles of white supremacy and eugenics gained popular support in the 1920s. *Compare Hunter*, 471 U.S. at 229 (discussing "a movement that swept the post-Reconstruction South to disenfranchise blacks"). Dr. Laughlin, a notorious eugenics "expert," promoted theories of racial inferiority through multiple reports and testimony to Congress. *Compare Democratic National Committee*, 948 F.3d at 1009 (local Republican chair widely shared a "racially tinged" video suggesting Hispanics were involved in ballot fraud). Key lawmakers like Chairman Johnson, Senator Blease, and Representative Box (along with Secretary of Labor Davis) promoted

these theories and repeatedly endorsed them during legislative sessions. *Compare id.* (state senator repeated "unfounded and often farfetched allegations" of ballot fraud); *Arce*, 793 F.3d at 978–79 (legislators accused ethnic studies program of inciting "racial warfare"). In other words, the evidence of racial discrimination in the legislative history and events leading up to the passage of the 1929 law easily meets—if not exceeds—the evidence in other *Arlington Heights* cases where race was found to be a "motivating factor."

### D.  "The legislature's departures from normal procedures or substantive conclusions."

Examining the fourth *Arlington Heights* factor—whether a decisionmaker departs from "normal procedures or substantive conclusions"—requires courts to consider any "procedural irregularities" leading up to the enactment of a law that could signal a discriminatory intent. Courts may also consider illogical or counter-intuitive conclusions in the decision-making process. *Compare Harkless v. Sweeny Independent School Dist.* 554 F.2d 1353, 1356 (5th Cir. 1977) (Fifth Circuit noted the illogical separation of Black teachers for evaluation and the point system used to compare them only to one another, as opposed to white teachers). Here, not only do the overtly racist statements of legislators during the law's passage show its discriminatory purpose, several irregularities and illogical conclusions in the passage of the 1929 law also implicate this factor.

First, the 1920s was the first and only era in which Congress openly relied on the now-discredited theory of eugenics to enact immigration legislation. Both the

1924 and 1929 immigration laws drew heavily on Dr. Laughlin's debunked beliefs that immigration control was a matter of racial engineering, akin to horse breeding. And while Congress ultimately acknowledged the discriminatory origins of the National Origins Act of 1924 and repealed it in 1965,[10] illegal reentry remains one of the few laws still in effect from that era. *See Carrillo-Lopez, supra*, at *8.

Second, the racial vitriol expressed during the debates was directed almost exclusively at Mexicans—even though Canadians were also entering the United States in record numbers. *See Carrillo-Lopez, supra*, at *9 (citing H3621[11] which stated that 81,506 Canadians entered the United States in 1928). If the 1929 Act were motivated by generalized xenophobia or economic anxiety, rather than racism, one would expect legislators to criticize foreigners across the board. But no legislator referred to Canadians as "mongrels"; none complained of "hordes" of Canadians crossing the border; none objected that Canadians were "poisoning the American citizen." And a representative from Wisconsin complained only about *Mexicans* taking jobs, not Canadians. *See* Appendix G, at H3619. These irregularities show that not only was Congress's passage of the Undesirable Aliens Act based on eugenics and racism, it also departed from typical substantive conclusions

---

[10] *See* Immigration and Nationality Act of 1965, Pub. L. 89–236 (abolishing the National Origins Formula); Gabriel J. Chin, *The Civil Rights Revolution Comes to Immigration Law: A New Look at the Immigration and Nationality Act of 1965*, 75 N.C. L. Rev. 273, 301 (1996) (noting Congress' "racial egalitarian motivation" for repealing the National Origins Act).

[11] Appendix G.

underlying immigration law.

E.   **"The impact of the official action and whether it bears more heavily on one race than another."**

Within a year of the 1929 law's passage, the government had prosecuted 7,001 border crossing crimes; by 1939, that number rose to over 44,000.[12] In each of these years, individuals from Mexico comprised no fewer than 84% of those convicted, and often made up as many as 99% of defendants.[13] And, as set forth above, the illegal reentry statute continues to "bear[] more heavily on Mexican and Latinx individuals." *Carrillo-Lopez, supra*, at 6.

In sum, applying the five *Arlington Heights* factors shows that racism and eugenics were, at minimum, a "motivating factor" in the passage of the Undesirable Aliens Act. And as new Supreme Court precedent confirms, courts must consider this historical evidence in determining whether a statute is constitutional. *See Ramos*, 140 S. Ct. at 1401 (citing the "racially discriminatory reasons that Louisiana and Oregon adopted their peculiar rules in the first place." 140 S. Ct. at 1401; see *also Espinoza v. Montana Dep't of Revenue,* 140 S. Ct. 2246, 2259 (2020) (majority relied on the law's "checkered tradition" of underlying religious discrimination, even

---

[12] Annual Report of the Attorney General of the United States for the Fiscal Year 1939, 37; Kelly Lytle Hernández, City of Inmates: Conquest, Rebellion, and the Rise of Human Caging in Los Angeles, 1771-1965, n.6 at 138–39 (UNC Press, 2017).

[13] Hernández, *supra* n. 6, at 138–39 (citing U.S. Bureau of Prisons, *Federal Offenders*, Fiscal Years, 1931–36.

though it was reenacted in the 1970s "for reasons unrelated to anti-Catholic bigotry.")

Here, the original illegal reentry law codified in the Undesirable Aliens Act of 1929 has been reenacted several times, most notably in the Immigration and Nationality Act of 1952.[14] But *Ramos* and *Espinoza* both confirm that not only do courts examine the racial motivations of a law at the time of its passage, later reenactments do not cleanse the law of its original taint.

## V.  The 1952 reenactment of the illegal reentry statute did not cleanse the statute of the taint of racism.

The parties and the district court agreed in *Carrillo-Lopez* that the evidence clearly indicated that, "the Act of 1929 was passed during a time when nativism and eugenics were widely accepted, both in the country at large and by Congress, and . . these racist theories ultimately fueled the Act's passage." 2021 WL 3667330 at *9. Relying on *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018), the government argued that the enactment of the 1952 law "in the absence of discriminatory intent, cleanse[d] it of prior discriminatory motivation." *Carrillo-Lopez,* 2021 WL3667330 at *9 & n.19. The Nevada court concluded, however, that Congress's failure to

---

[14] *See* June 27, 1952, c. 477, Title II, ch. 8, § 276, 66 Stat. 229; Pub.L. 100-690, Title VII, § 7345(a), Nov. 18, 1988, 102 Stat. 4471; Pub.L. 101-649, Title V, § 543(b)(3), Nov. 29, 1990, 104 Stat. 5059; Pub.L. 103-322, Title XIII, § 130001(b), Sept. 13, 1994, 108 Stat. 2023; Pub.L. 104-132, Title IV, §§ 401(c), 438(b), 441(a), Apr. 24, 1996, 110 Stat. 1267, 1276, 1279; Pub.L. 104-208, Div. C, Title III, §§ 305(b), 308(d)(4)(J), (e)(1)(K), (14)(A), 324(a), (b), Sept. 30, 1996, 110 Stat. 3009-606, 3009-618 to 3009-620, 3009-629.

repudiate of the racial animus that led to the adoption of the original statute, coupled with contemporaneous continuing expressions of racism in 1952 demonstrated, under the totality of the circumstances, that the current law was likewise the product of racial discrimination. *Id.* at *9-11. *But see Machic-Xiap*, 2021 WL 3362738 at *12 (agreeing that the Act of 1929 was racially motivated but holding that the taint was removed in 1952); *Wence*, 2021 WL 2463567 at**7-8. Similarly, the subsequent amendments in 1988, 1990, 1994 and 1996 increased the punishment range for the offense without addressing its racist origins. *Carrillo-Lopez,* 2021 WL 3667330 at *4 & nn.9-10.

The Nevada court easily distinguished *Abbott,* the case relied upon by the government. First, the court noted that the illegal reentry statute was nearly identical to the original problematic version with the exception of a broader enforcement provision. *Carrillo-Lopez*, 2021 WL 3667330 at *17. In *Abbott*, the Legislature adopted an entirely new plan designed to address the deficiencies identified in the first. And the Supreme Court found that the "new legislature lacked discriminatory intent precisely because of the way that it responded to the challenged provision." *Carrillo-Lopez*, *supra* at *17.

In contrast, Section 1326 was neither substantively changed nor debated except that it expanded the punitive reach of the statute. In fact, as set forth below, the 1952 Congress did not just fail to repudiate racial animus. They chose to recodify

and make harsher illegal reentry at the same time as they expanded grounds for deportation and limited discretionary relief from deportation. They recodified illegal reentry with knowledge of the law's disparate impact. They recodified over a presidential veto calling out the bill's racism and criticizing the expanded grounds for deportation. The same Congress also passed a few months earlier a discrete piece of alien harboring legislation known as the "Wetback Bill" that exempted employers from prosecution. Exempting employers, who incentivize illegal immigration and are vastly more responsive to deterrence than impoverished and uneducated Latinx workers, in the same proverbial breath as reenacting illegal reentry, and with full knowledge of the disparate impact of illegal reentry on Latinx migrants, is among the many factors demonstrating racial animus was a motivating factor for the 1952 Congress. *See Carrillo-Lopez, supra*, at *10.

## A.   The Lack of Debate Regarding the Illegal Reentry Provision

The INA or the McCarran-Walter Act of 1952 collected, recodified, and revised the many existing laws governing immigration and reorganized the structure of immigration law statutes. But significantly, Congress did not repudiate the racial animus that led to the adoption of the statute in 1929. *Carrillo-Lopez*, supra at *10.

The primary focus of the Act was the development of quotas for immigrants from various countries. *See Carrillo-Lopez, supra* at *11 n.23. But, as Professor Gonzalez O'Brien testified at the Nevada hearing, "the contrast between extensive

congressional debate about other national origin provisions and the comparative lack thereof around Section 1326 suggests an acceptance of its history." *See Carrillo-Lopez, supra* at 11 (citing Transcript at 181). Representatives of the 1952 Congress acknowledged the "problematic racial aspects" of the 1924 legislation, but they chose "not only to recodify . . . 1326, but to recodify it [] without any examination." *Id*. (citing Transcript at 180-81); *see also* Transcript at 102. Congress had the "opportunity to either adopt [the] racial animus [of 1929] or refute its improper motivation and clarify a purpose for the statue that did not violate the Equal Protection Clause. Here, the 1952 Congress remained silent, even when other provisions of the law were being debated." *Carrillo-Lopez, supra*, at *11. Moreover, the 1952 quotas, while they eliminated entire exclusions based on national origin, continued the practice of providing a preference for Europeans. *Id*. at *11 n.23. *See also* Transcript at 117. Professor Gonzalez O'Brien's testimony depicted a "Congress that was more concerned with which racial and ethnic groups warranted continued discriminatory exclusion, rather than any desire to confront or revise the nativism reflected in the Act of 1929." *Carrillo-Lopez, supra*, at *11.

**B.    The legislative history of both the McCarran-Walter Act and the so-called "Wetback Bill" demonstrate racial animus.**

The legislative history of the 1952 recodification reflects the same desire as the 1929 legislature for a whites-preferred system for permanent immigration while accommodating continued access to an exploitable, racially identified labor force.

Congress recodified illegal reentry will full knowledge of its disparate impact on Latinx people. Congress also expanded grounds for deportation and added language to make illegal reentry easier to prosecute and convict. And Congress passed the law over a presidential veto that explicitly called out the law for its racism. In short, the 1952 Act too was motivated by racial animus.

### 1.    The President Truman veto

In his veto statement, President Truman condemned the INA as "legislation which would perpetuate injustices of long standing against many nationals of the world," and "intensify the pressure and inhumane aspects of our immigration procedures." *Carrillo-Lopez, supra*, at 12 (quoting Truman veto statement attached as Appendix K). The President also lamented the sharp restrictions on the ability of citizens and residents "to save family members from deportation." *See Appendix K.* While the President did not explicitly address racism against Mexicans and Latinx individuals, he argued against the harsh aspects of the country's immigration policy. *See Carrillo-Lopez, supra*, at *12 & n.24. It did not matter. Congress overrode the President's veto. *Id.*

Moreover, during 20 years that had transpired between illegal reentry's enactment and reenactment, the profoundly disparate impact of the law was apparent. The law was effective in accomplishing its design to target Latinx individuals:

> With stunning precision, the criminalization of unlawful entry caged thousands of Mexico's proverbial birds of passage. Within one year of enforcement, U.S. attorneys prosecuted 7,001 cases of unlawful entry. By 1939, they had prosecuted more than 44,000 cases.
>
> In no year did the U.S. attorneys' conviction rate fall below 93 percent of all immigration cases. Taking custody of individuals convicted on federal immigration charges, the U.S. Bureau of Prisons reported that Mexicans never comprised less than 84.6 percent of all imprisoned immigrants. Some years, Mexicans comprised 99 percent of immigration offenders. Therefore, by the end of the 1930s, tens of thousands of Mexicans had been arrested, charged, prosecuted, and imprisoned for unlawfully entering the United States. With 71 percent of all Mexican federal prisoners charged with immigration crimes, no other federal legislation—not prohibition, not drug laws, and neither laws against prostitution nor the Mann act— sent more Mexicans to federal prison during those years.

Appendix A (Hernandez declaration at 7-8). "Discriminatory purpose 'may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another." *N. Carolina State Conference of NAACP v. McCrory*, 831 F.3d 204, 220 (4th Cir. 2016).

### 2.      Deputy Attorney General Peyton Ford Urges Expansion of the Illegal Reentry Statute.

The Nevada court also noted that the only substantive change made in the illegal reentry law was recommended by Deputy Attorney General Peyton Ford, who urged an expansion to include prosecution of aliens "found in" the United States. *Carrillo-Lopez, supra*, at *13. With respect to the "found in" clause, Deputy Attorney General Ford stated, "It adds to existing law by creating a crime which will

24

be committed if a previously deported alien is subsequently found in the United States. This change would overcome the inadequacies in existing law, which have been observed in those cases in which it is not possible for the Immigration and Naturalization Service to establish the place of reentry, and hence the proper venue, arising in prosecutions against a deported alien under the 1929 act." Appendix L. (Ford letter). In this same letter, Ford referenced "conveyers and receivers of the wetback". *Id*.

The use the racialized slur "wetback" to refer to Latino migrants was not limited to Ford's letter. In the words of Professor Gonzalez-O'Brien:

> And that term "wetback" is one that is racially derogatory, was recognized as being racially derogatory at the time, and has roots that link back to some of the discussions around both the quotas being applied to Mexico, of discussions and debate of the Undesirable Aliens Act. And this term "wetback" is referenced in a number of pieces of legislation at the time, including a Senate Bill 1851 -- well, also known as the, uh, Act of March 20th, 1952, which is referenced in the Congressional Record as the Wetback Bill. And this was an empty harboring Bill, but regularly referred to Mexicans as wetbacks. And the term with "wetback" comes from the idea that individuals who are entering without inspection have to do so at an area where there is no bridge over the Rio Grande River and, therefore, they get wet and, therefore, the term wetback. But across the period of the 1940s and 1950s, this term has -- is associated, and almost synonymous with Mexicans. And in addition to being synonymous with Mexicans and racialized in much the same way, it also has the attribution of a lot of the negative stereotypes that were associated with Mexican immigrants in the push, or quotas to be

applied to immigration from Mexico and south of the Rio
Grande, as well as during debate over the Undesirable
Aliens Act.

Appendix C (Transcript at 89-90). Ford wasn't a lone voice or a fringe figure in

using this racial slur but it was his request alone that added "found in," ensuring

venue could be established anywhere migrants were found. *See* Transcript at 101-

02.

### 3.     The Wetback Bill

At the same time as the INA was being considered so too was the so-called

"Wetback Bill", which passed a few months before. The bill's stated aim was "to

assist in preventing aliens from entering or remaining in the United States illegally."

*Carrillo-Lopez, supra*, at *14 (citing United States Statutes at Large, 82 Cong. Ch.

108, March 20, 1952, 66 Stat. 26 (March 20, 1952)). Despite its stated aim it

*excluded* employers from prosecution. The Bill provides that anyone who

> willfully knowingly encourages or induces, or attempts to
> encourage or induce, either directly or indirectly the entry
> into the United States of any alien, including an alien
> seaman, not duly admitted by an immigration officer or
> not lawfully entitled to enter or reside within the United
> States under the terms of this Act or any other law relating
> to the immigration or expulsion of aliens, shall be guilty
> of a-felony, and upon conviction thereof shall be punished
> by a fine not exceeding $2,000 or by imprisonment for it
> term not exceeding five years, or both, for each alien in
> respect to whom any violation of this subsection occurs:
> *Provided, however, That for the purposes of this section,
> employment (including the its usual and normal practices
> incidental to employment) shall not constitute harboring.*

26

66 Stat.26 (emphasis added). The "Wetback Bill's" legislative history involved a nakedly racist debate over the "wetback problem." "[I]ndividuals, like, Senator Kilgore of West Virginia, who notes in debate over the quote, unquote, Wetback Bill, that practically every state in the Union has had the wetback problem. Some of these people cannot meet the standards of immigration. They may be criminals because they are wetbacks. They can be kept in a state of peonage." Appendix C (Transcript at 107).

The "Wetback Bill" was passed by the same Congress during the same time frame and with the same express aim as illegal reentry: "preventing aliens from entering or remaining in the United States illegally." *Carrillo-Lopez, supra*, at \*14 (citing 66 Stat.26). But it remained a discrete piece of legislation. Its significance is more than its racialized legislative history. It imposed criminal penalties on those who "harbored" aliens but exempted employers from criminal prosecution. It did so despite the fact that employers were the main reason Latinx individuals were coming to the United States. American agricultural interests were reliant on the cheap labor provided by Latinx migrants. There is no starker evidence that deterring illegal immigration is not a true goal of illegal reentry than the express exemption of those who incentivize illegal immigration – i.e., employers. For many reasons, employers are vastly more responsive to deterrence than are impoverished and uneducated Latinx workers. By far the most effective means of deterring illegal immigration,

therefore, is to punish employers who hire illegal immigrants. Yet, Congress didn't.

This exemption is particularly relevant to two *Arlington Heights* factors: (1) "the specific sequence of events leading to the challenged action and (2) "the [legislature's] departures from normal procedures or substantive conclusions." *Arce v. Douglas*, 793 F.3d 968, 977 (9th Cir. 2015) (citing *Arlington Heights*, 429 U.S. at 266–68). In undermining its own stated purpose by exempting employers, and using a discrete piece of legislation, the "Wetback Bill" illustrates that the intent of congress was to preserve the influx of cheap and exploitable labor, while simultaneously marginalizing those workers and excluding them from full participation in American life. In instructing courts to consider the broader context surrounding the passage of legislation, the Fourth Circuit recognized that "[o]utright admissions of impermissible racial motivation are infrequent and plaintiffs often must rely upon other evidence. *N. Carolina State Conference of NAACP v. McCrory*, 831 F.3d 204, 220–21 (4th Cir. 2016). The "Wetback Bill" illustrates that "the 1952 and 1929 congresses were both balancing the hunger of the agricultural industry for exploitable labor and the desire to keep America's identity white." *Carrillo-Lopez, supra*, at 14.

The 1952 Congress carried forward the 1929 Act and made it easier to prosecute Latinx migrants wherever they were "found." It expanded upon its predecessor. It also expanded grounds for deportation and narrowed grounds for

discretionary relief. Thus, it ensured, again, that Latinos would never gain a foothold in the United States. Latinx migrants were maintained as a source of exploitable labor, but eternally vulnerable to deportation and prosecution.

## C.    The historical events that bridged 1929 and 1952

The historical lead up to a law is a key *Arlington Heights* factor. Here, the two major historical events with respect to Latinos that bridge 1929 and 1952 were the "repatriation" drives during the Great Depression and the Bracero Program. Both events demonstrate an intent to prevent permanent settlement and maintain control over a temporary, exploitable workforce.

### 1.    Mexican Repatriation

During the Great Depression, an estimated 400,000 to over 1 million Mexicans and Mexican Americans were coerced and threatened into leaving the United States. 60% of whom were U.S. Citizens. They weren't "repatriated." They were racially targeted and forced from their homes. It was a scare campaign that hit at those who looked to be Mexican, not a drive to actually check papers and target those here without permission. If you looked Mexican, you were at risk. As Professor Gonzalez O'Brien testified:

> As the U.S. headed into the Great Depression, this push to get Mexican immigrants to repatriate to Mexico. And, it was relatively successful. The numbers vary in terms of the number of immigrants -- or the number of Mexicans -- let me clarify that -- the number of Mexicans who left the United States, with, kind of, the lowest estimates being around 400,000, and some of the higher

estimates being well over a million who left for Mexico. And some of the estimates of that is, you know, that around 60 percent of those who left -- who went back to the Mexico or went to Mexico were, in fact, American citizens. Now, there's a question of, well, why are Mexican -- if they're American citizens, why are they returning to Mexico?

And I think that part of the story here is that this was a campaign that was meant to fuel voluntary re-patronization. But, that voluntary re-patronization was, in some cases, driven by a sense of the threat of deportation or the threat of additional penalties if those individuals did not return to Mexico. And in particular, there was -- there were a number of raids in Los Angeles. And along with those raids, there was publicity released announcing the raids in advance; that there would be arrests; and that these raids were coming to the area; and that, uh -- this idea that this would create kind of a psychological push to get people to leave for Mexico.

Appendix C (Transcript at 86:3-87:6). This constitutes overwhelming evidence of racial animus.

### 2.    Bracero Program

Following, the "repatriation" of Latinos, the Great Depression ended, and the United States again needed an exploitable source of labor as the United States engagement in World War II ramped up. In 1942, the United States started a Mexican Farm Labor Program, also known as Operation Bracero. Transcript at 77. After threatening and deporting hundreds of thousands of Mexicans in the 30s, the Bracero Program funneled Mexicans back into the United States on a legal, temporary basis in exchange for the promise of wages and humane treatment. *Id*. at 120-22, 126. The program never delivered on those promises and instead spurred

illegal immigration as some employers didn't like the red tape and found it more advantageous to directly recruit Mexicans to labor for their farms and factories. *Id.* at 93-95, 120. These Braceros were viewed as "disposible labor," who posed no real threat as long as they returned to their homes. *Id.* at 122. But the locals did not like the presence of so many undocumented workers, and, beginning in 1954, the United States deported as many as a million people – undocumented or not – as part of "Operation Wetback." *Id.* at 120-24.[15]

### D.    White Supremacy in America between 1929 and 1952

White supremacy was alive and well between 1929 and 1952. Schools were segregated. Restaurants had signs to keep out Mexican and "Negro" patrons. Some of the most overt racism perpetuated against Latinx individuals resulted in litigation. Those cases provide a tragic snapshot of the racial animus against Latinx individuals that characterized this period of time.

In 1947, a federal lawsuit was brought alleging that the segregation of Mexican children in California schools violated the Fourteenth Amendment. It succeeded. *Westminster Sch. Dist. of Orange Cty. v. Mendez*, 161 F.2d 774, 781 (9th Cir. 1947) ("By enforcing the segregation of school children of Mexican descent

---

[15] Operation Wetback followed Operation Bracero. Operation Wetback was based xenophobia, and resulted in sizable large-scale violations of people's rights, including the forced deportation of U.S. citizens. Like the Mexican "repatriation" drives of the 1930s, it resulted in the mass deportation of Latinos, many of whom were American citizens. Appendix C (Transcript at 122-123).

against their will and contrary to the laws of California, respondents have violated the federal law as provided in the Fourteenth Amendment to the Federal Constitution by depriving them of liberty and property without due process of law and by denying to them the equal protection of the laws."). *See also Gonzales v. Sheely*, 96 F. Supp. 1004 (D. Ariz. 1951) (holding that practice of public elementary school district authorities of segregating children of Mexican descent in separate school buildings with inferior accommodations and facilities was discriminatory and illegal in that it deprived children of constitutional rights of due process of law and equal protection of the laws.).

The Supreme Court's decision in *Hernandez v. Texas*, 347 U.S. 475 (1954) (holding that exclusion of Mexican Americans from jury service violated the equal protection clause of the Fourteenth Amendment), vividly illustrates the rampant discrimination against people of Mexican descent during the 1950's. The "testimony of responsible officials and citizens contained the admission that residents of the community distinguished between 'White' and 'Mexican.'" *Id*. at 479. The "participation of persons of Mexican descent in business and community groups was shown to be slight." *Id*. Until very recent times, "children of Mexican descent were required to attend a segregated school for the first four grades." *Id*. "There was 'at least one restaurant in town [that] prominently displayed a sign announcing, 'No Mexicans Served.'" *Id*. And, "on the courthouse grounds at the time of the hearing,

there were two men's toilets, one unmarked, and the other marked 'Colored Men'
and 'Hombres Aqui' ('Men Here')." *Id*. at 479-80.

The period relevant to this motion was a period characterized by white
supremacy driven by the same race-based ideals of the earlier eugenics' movement.
At the time, the laws of many states banned interracial marriage. It was not until
1967, fifteen years after the INA, that the Supreme Court finally decided in *Loving
v. Virginia*, 388 U.S. 1 (1967), that laws banning interracial marriage were
unconstitutional. The Virginia miscegenation law struck down in *Loving* had been
upheld by the state's supreme court in 1955, which had opined "that the State's
legitimate purposes were 'to preserve the racial integrity of its citizens,' and to
prevent 'the corruption of blood,' 'a mongrel breed of citizens,' and 'the obliteration
of racial pride,' obviously an endorsement of the doctrine of White Supremacy."
*Loving*, 388 U.S. at 7 (citation omitted). Thus, three years after the INA, the Virginia
Supreme Court still openly endorsed a law against interracial marriage to prevent
the corruption of blood, to preserve white supremacy, to prevent people who loved
each other from marrying, lest they give birth to "mongrels," using words
remarkably similar to those used to endorse the Undesirable Aliens Act of 1929.

## VI.  Conclusion

Ultimately, the Nevada district court concluded, under the totality of the
circumstances, that the same factors motivated the passage of the 1952 statute as

were present in 1929:

> The totality of evidence shows that the same factors motivating the passage of Section 1326 in 1929 were present in 1952. Not only did Congress fail to repudiate the racial animus clearly present in 1929, but it expanded the government's power to enforce unlawful reentry, despite President Truman's call to reimagine immigration laws. The 1952 Congress incorporated the advice of supporters of the bill who used racial epithets in official documents, while contemporaneously passing another bill targeting "wetbacks." Although it is "not easy" to prove that racism motivated the passage of a particular statute, the Court reasons that it cannot be impossible, or *Arlington Heights* would stand for nothing

*Carrillo-Lopez*, 2021 WL 2021 WL 3667330 at *16.

In other words, the 1952 Congress did not reenact illegal reentry despite its racist origins. It reenacted it because of them. It made Latinx individuals easier to deport, prosecute, and convict, and in the same proverbial breath exempted their employers from prosecution.

The district court in Nevada correctly concluded that the government had failed to establish a nondiscriminatory motivation for reenacting Section 1326 in 1952 that existed independently from the discriminatory motivations in 1929 and 1952. Section 1326 carries forward to today its racist forebears.

For the foregoing reasons, this Court should hold that 1326 violates the equal protection guarantee of the Fifth Amendment and that the charges in this case should be dismissed.

Respectfully submitted,

 s/ Marjorie A. Meyers
MARJORIE A. MEYERS
Federal Public Defender
Southern District of Texas No. 3233
Texas State Bar No. 14003750
Attorney for Defendant
440 Louisiana Street, Suite 1350
Houston, Texas 77002-1056
Telephone:          713.718.4600
Facsimile:          713.718.4610

## CERTIFICATE OF CONFERENCE

I certify that I conferred with Assistant United States Attorney Charmaine Holder, who indicated that the government is opposed to this motion.

/s/ Marjorie A. Meyers
MARJORIE A. MEYERS

## CERTIFICATE OF SERVICE

I certify that on September 27, 2021, a copy of the foregoing was served by Notification of Electronic Filing on Assistant United States Attorney Charmaine Holder.

/s/ Marjorie A. Meyers
MARJORIE A. MEYERS