IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | CR. NO. H-21-440 |
| | § | |
| JUAN ANTONIO HERNANDEZ-LOPEZ, | § | |
| Defendant | § | |

## THE UNITED STATES' OPPOSITION TO DEFENDANT JUAN ANTONIO HERNANDEZ-LOPEZ'S MOTION TO DISMISS THE INDICTMENT

## INTRODUCTION

This Court should deny Juan Antonio Hernandez-Lopez's motion to dismiss the indictment charging him with illegal reentry in violation 8 U.S.C. § 1326. As explained below, Hernandez-Lopez's argument—that this facially neutral statute actually discriminates based on race and is thus unconstitutional—has been rejected by numerous courts and should be rejected here as well. The statute furthers the legitimate government interest of regulating immigration and the country's international borders. Moreover, Hernandez-Lopez has not shown that Congress as a whole was motivated by discriminatory intent and racial animus when it passed the statute in 1952 or when it amended it in subsequent years. Nor has he shown that Congress intended the statute to have a racially disparate impact on persons entering the United States. Hernandez-Lopez's motion should be denied and the indictment should stand.

## FACTUAL BACKGROUND

Hernandez-Lopez, a citizen of El Salvador, is charged by indictment with illegal reentry into the United States, a violation of 8 U.S.C. § 1326(a).  *See* Dkt. No.2   Juan Antonio Hernandez-Lopez was previously removed from the United States to his home country of El Salvador on November 28, 2008, after having been convicted of driving while intoxicated and while license suspended.  Subsequent to his 2008 deportation, Hernandez Lopez was once again found in the United States on March 16, 2020 following a third offense of driving while intoxicated, for which he was sentenced to two years of imprisonment. Dkt. No. 1.  Hernandez-Lopez is now before this Court on the illegal re-entry charge.  After a September 21, detention hearing, Hernandez-Lopez was released on a $50,000 unsecured bond with GPS monitoring and home restriction.  Dkt. No.14.  On September 27, Hernandez-Lopez filed this Motion to Dismiss Indictment alleging that 8 U.S.C. § 1326 discriminates based on race and is unconstitutional. Dkt. No. 15.

## ARGUMENT

The Equal Protection Clause protects against actions taken by state actors and requires that similarly situated persons be treated alike.  *See Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 439 (1985).  The Fifth Amendment places the same requirement on the federal government.  *E.g., Richard v. Hinson*, 70 F.3d 415, 417 (5th Cir. 1995). Hernandez-Lopez acknowledges that 8 U.S.C. § 1326 is facially neutral and treats similarly situated persons—aliens who enter the country without authorization—alike.  Dkt. No. 15 at 4.  He nonetheless contends that § 1326 violates the Fifth Amendment and Equal Protection principles because the law was motivated by a discriminatory purpose and

2

"disparately impacts a disfavored group." *Id.* This argument fails. For the reasons below, this Court should deny Hernandez-Lopez's motion to dismiss.

## I. THE COURT SHOULD APPLY RATIONAL BASIS REVIEW IN ANALYZING HERNANDEZ-LOPEZ'S CONSTITUTIONAL CHALLENGE TO 8 U.S.C. § 1326

Lopez-Hernandez argues that his attack on the constitutionality of § 1326 should be analyzed using the framework set forth in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977). But laws addressing immigration are typically reviewed under a rational basis standard. For example, in *Trump v. Hawaii*, 138 S. Ct. 2392, 2316-17 (2018), plaintiffs challenged a proclamation barring admission of foreign nationals from seven countries, arguing that the proclamation violated the First Amendment by singling out Muslims for disfavored treatment. "Relying on Establishment Clause precedents concerning laws and policies applied domestically, plaintiffs allege[d] that the primary purpose of the Proclamation was religious animus and that the President's stated concerns about vetting protocols and national security were but pretexts for discriminating against Muslims." *Id.* at 2417. First, in addressing the appropriate standard of review, the Supreme Court explained that

> The case before us differs in numerous respects from the conventional Establishment Clause claim. Unlike the typical suit involving religious displays or school prayer, plaintiffs seek to invalidate a national security directive regulating the entry of aliens abroad. Their claim accordingly raises a number of delicate issues regarding the scope of the constitutional right and the manner of proof. The Proclamation, moreover, is facially neutral toward religion. Plaintiffs therefore ask the Court to probe the sincerity of the stated justifications for the policy by reference to extrinsic statements—many of which were made before the President took the oath of office. These various aspects of plaintiffs' challenge inform our standard of review.

*Id.* at 2418.

The Court in *Trump v. Hawaii* then explained that, for more than a century, it had "recognized that the admission and exclusion of foreign nationals is a 'fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control.'" *Id.* (quoting *Fiallo v. Bell*, 430 U.S. 787, 792 (1977)). Thus, it has traditionally applied a "circumscribed judicial inquiry" and has asked whether the law or action is based on "'a facially legitimate and bona fide reason[, without] look[ing] behind the exercise of that discretion.'" *Id.* at 2419 (quoting *Kleindienst v. Mandel*, 408 U.S. 753, 756-57 (1972)). The Court's opinions since *Mandel* "have reaffirmed and applied its deferential standard of review across different contexts and constitutional claims." *Id.*

Accordingly, the Court continued this practice in *Trump v. Hawaii*—"asking only whether the policy is facially legitimate and valid"—while "assum[ing] that we may look behind the face of the Proclamation to the extent of applying rational basis review." *Id.* The Court explained that it would ask whether "the entry policy is plausibly related to the Government's stated objective" and would "uphold the policy so long as it can reasonably be understood to result from a justification independent of unconstitutional grounds." *Id.* The Court ultimately determined that the proclamation was plausibly related to its stated objective, and as a result allowed the proclamation to remain in place. *Id.* at 2423.

The deferential standard applied in *Trump v. Hawaii* should also apply here. Congress enacted the Immigration and Nationality Act (INA) in 1952 in an effort to provide a comprehensive and cohesive set of immigration laws. *E.g.* Pub. L. No. 82-414, 66 Stat. 163 (Introduction) (explaining that the INA is designed to "revise the laws relating

4

to immigration, naturalization, and nationality" in the United States); *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 756 (9th Cir. 2018) ("In 1952, Congress replaced this disparate statutory scheme with the [INA], which remains the governing statutory framework."). Congress included as part of the INA 8 U.S.C. § 1326, which criminalizes unauthorized reentry into the United States by a foreign national who was previously deported. Both § 1326 specifically and the INA more generally embody Congress's expansive legislative power to control the admission and exclusion of aliens and are thus "largely immune from judicial control." *Shaughnessy v. Mezei*, 345 U.S. 206, 210 (1953); *Fiallo*, 430 U.S. at 792. Rational basis review is therefore appropriate.

Applying a more exacting standard of review would place this case at odds with longstanding Supreme Court and Fifth Circuit precedent. *Fiallo* and *Hawaii* preclude courts from rigorously probing the legislative and executive motivations behind immigration regulations. And the Fifth Circuit has repeatedly applied rational basis review to immigration-related laws. *See, e.g., Bright v. Parra*, 919 F.2d 31 (5th Cir. 1990) (applying *Fiallo's* deferential standard to challenge to two-year waiting period for spousal visa); *Malagon de Fuentes v. Gonzales*, 462 F.3d 498, 503-04 (5th Cir. 2006) (applying rational basis review to an equal protection claim attacking "a congressionally-drawn distinction among aliens"); *Van Staden v. St. Martin*, 664 F.3d 56, 58 (5th Cir. 2011) (reviewing state nursing regulation addressing immigration status for rational basis).

Applying the *Arlington Heights* standard here—"a substantial intrusion into the workings of" a coequal branch, 429 U.S. at 268 n.18—instead of rational basis would represent a significant departure from precedent. There is no need for such a departure

here, especially given that the Court is reviewing an immigration law that is facially neutral.    Hernandez-Lopez's constitutional challenge to this immigration-related law should therefore be reviewed for rational basis only.[1]

## II.    8 U.S.C. § 1326 IS SUPPORTED BY A RATIONAL BASIS AND IS THEREFORE CONSTITUTIONAL

"Rational basis review begins with a strong presumption of constitutional validity." *Flores-Ledezma v. Gonzales*, 415 F.3d 375, 381 (5th Cir 2005) (citing *Heller v. Doe*, 509 U.S. 312, 319 (1993)).  To prevail, Hernandez-Lopez must show that the law, as applied, is arbitrary; it is not the government's burden to establish rationality.  *Id.* (citing *Kite v. Marshall*, 661 F.2d 1027, 1030 (5th Cir. 1981)).  "Under rational basis review, differential treatment must be upheld against [an] equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Madriz-Alvarado v. Ashcroft*, 383 F.3d 321, 332 (5th Cir. 2004) (quotations omitted).

In *Malagon de Fuentes*, the petitioner argued that 8 U.S.C. § 1101(a)(13) violated equal protection principles because the statute punished lawful permanent residents who had committed offenses under 8 U.S.C. § 1182(a)(2) and left the country over those who had also committed offenses but had not left.  462 F.3d at 503.  The Fifth Circuit analyzed the statute for a rational basis and concluded that "Congress' choice to disfavor the

---

[1] The Court should also reject any argument that rational basis review is precluded for statutes that assess criminal penalties.  *Cf. United States v. Carillo-Lopez*, 2021 WL 3667330, *2 (D. Nev. Aug. 18, 2021).  Courts regularly apply rational basis review to laws that are both related to immigration and assess criminal penalties.  *See, e.g., United States v. Ruiz-Chairez*, 493 F.3d 1089, 1091 (9th Cir. 2007) (applying rational basis review to a challenge to a Sentencing Guideline that implements Section 1326 and provides for a greater enhancement for "illegal reentrants … than other felons with the same prior criminal record"); *United States v. Ferreira*, 275 F.3d 1020, 1025-26 (11th Cir. 2001) (rejecting a civil-criminal distinction).

admission of aliens who have committed offenses is not irrational." *Id.* at 504. It was also not irrational for Congress "to make getting into the United States more difficult than remaining." *Id.* As the Fifth Circuit explained, "[w]here immigration is concerned, it is hardly irrational to attach legal detriment to leaving the country." *Id.*

The Fifth Circuit has also upheld laws under rational basis review that distinguish between excludable aliens and deportable aliens, *Cabrales v. Holder*, 632 F.3d 886, 894 (5th Cir. 2011), that allow the BOP to offer some rehabilitation programs to prisoners while denying access to prisoners who have ICE detainers lodged against them, *see Gallegos-Hernandez v. Holder*, 688 F.3d 190, 195-96 (5th Cir. 2012), and that afford voluntary departure to aliens who have been in the United States for at least one year but deny it to those who have not. *Salazar-Trivino v. Gonzales*, 145 F. App'x 90 (5th Cir. 2005) (unpublished). In each of these cases, the challenger identified an immigration-related law that treated one group of individuals differently than another, but in each case, the Court found that the differential treatment was supported by a rational basis.

In this case, Hernandez-Lopez has not identified differential treatment between two different groups of people, much less an irrational one. He argues that 8 U.S.C. § 1326 has a disparate impact on "Mexicans and other Latinx individuals," Dkt. No. 15 at 2, but the law does not identify a class of persons by race or country of origin. And Hernandez-Lopez does not argue that the law is selectively enforced. Indeed, he implicitly acknowledges that it is facially neutral and has been enforced against non-Latinx persons. *Id.* at 7. To the extent it treats one group of people differently, that group is aliens who reenter the country without authorization following a removal, deportation, exclusion or

denial of admission.  *E.g., United States v. Hernandez-Guerrero*, 147 F.3d 1075, 1078 (9th Cir. 1998) ("[I]ts clear purpose is to deter aliens who have been forced to leave the United States from reentering the United States.").  This is not a racial or ethnic distinction.  It is one intrinsically related to the country's interest in maintaining and monitoring its borders.  This is a legitimate interest.

And it is a strong, longstanding legitimate government interest.  "It is axiomatic that the United States, as a sovereign, has the inherent authority to protect, and a paramount interest in protecting, its territorial integrity."  *United States v. Flores-Montano*, 541 U.S. 149, 153 (2004); *Fong Yue Ting v. United States*, 149 U.S. 698, 711 (1893) ("The right to exclude or to expel all aliens, or any class of aliens, absolutely or upon certain conditions, in war or in peace, being an inherent and inalienable right of every sovereign and independent nation, essential to its safety, its independence, and its welfare").  The Supreme Court explained over a century ago that it is "plainly competent for Congress to declare the act of an alien in remaining unlawfully within the United States to be an offence punishable by fine or imprisonment."  *Wong Wing v. United States*, 163 U.S. 228, 235 (1896); *see also United States v. Portillo-Munoz*, 643 F.3d 437, 442 (5th Cir. 2011) ("The courts have made clear that the Constitution does not prohibit Congress from making laws that distinguish between citizens and aliens and between lawful and illegal aliens.").  In sum, the government has a legitimate interest in controlling its borders and immigration across those borders, and it may pass legislation furthering that interest.

That legitimate government interest is specifically furthered by § 1326.  As the Ninth Circuit has explained, "it is plain that § 1326 is a necessary piece of the immigration-

regulation framework; without the threat of criminal prosecution that it provides, Congress's immigration-regulation authority would be fatally undermined—all bark and no bite." *Hernandez-Guerrero*, 147 F.3d at 1078; *see also United States v. Henry*, 111 F.3d 111, 114 (11th Cir. 1997) ("Section 1326 … is a regulatory statute enacted to assist in the control of unlawful immigration by aliens"). Hernandez-Lopez has not shown otherwise. Section 1326 is rationally related—in fact, is intimately related—to the legitimate government interest of regulating immigration, and the law does not treat one group of unauthorized aliens previously removed or deported different from another (except on criminal history). *E.g., United States v. Novondo-Ceballos*, 2021 WL 3570229, *4 (D.N.M. Aug. 12, 2021) ("Here, § 1326 satisfies the rational basis test because it 'is a regulatory statute enacted to assist in the control of unlawful immigration by aliens." (quoting *Guerrero*, 147 F.3d at 1078)).[2]

Section 1326 satisfies rational basis review and Hernandez-Lopez's equal protection challenge should therefore be rejected.

## III.   8 U.S.C. § 1326 IS ALSO CONSTITUTIONAL WHEN ANALYZED USING THE *ARLINGTON HEIGHTS* TEST

Hernandez-Lopez argues that his challenge should be reviewed using the *Arlington Heights* framework and not for a rational basis. But Section 1326 is constitutional even when reviewed under the more rigorous standard set forth in *Arlington Heights*.

---

[2] Several courts have reviewed equal protection challenges to Section 1326 under the rational basis standard, and those that have done so have concluded that it satisfies that standard. *See United States v. Amador-Bonilla*, 2021 WL 5349103 (W.D. Okla. Nov. 16, 2021); *United States v. Samuels-Baldayaquez*, 2021 WL 5166488 (N.D. Ohio Nov. 5, 2021); *United States v. Gutierrez-Barba*, 2021 WL 2138801 (D. Ariz. May 25, 2021); *United States v. Ruiz-Rivera*, 2020 WL 5230519 (S.D. Cal. Sept. 2, 2020) (same for 8 U.S.C. § 1325).

### A.      The Arlington Heights Factors Do Not Support Hernandez-Lopez's Equal Protection Challenge

*Arlington Heights* requires Hernandez-Lopez to show both (1) that the official government action (the statute, in this case) results in a racially disproportionate impact and (2) that it was motivated by a racially discriminatory intent or purpose.  429 U.S. at 264-65 ("official action will not be held unconstitutional solely because it results in a racially disproportionate impact…. Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause.").  To demonstrate "whether invidious discriminatory purpose was a motivating factor," courts look at (i) the impact of the official action, (ii) the historical background of the decision (iii) including legislative history, and (iv) whether the action involved "[d]epartures from the normal procedural sequence" or (v) substantive departures. *Id.* 266-68 (noting that these "subjects of proper inquiry" are non-exhaustive).   "The challengers bear the burden to show that racial discrimination was a 'substantial or motivating factor behind the enactment of the law;'" if they do, "the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor."  *Veasey v. Abbott*, 830 F.3d 216, 231 (5th Cir. 2016) (en banc) (quoting *Hunter v. Underwood*, 471 U.S. 222, 228 (1985)); *see also Rollerson v. Brazos River Harbor Navigation Dist.*, 6 F.4th 633, 640 (5th Cir. 2021) ("To plead [an official action is made] with discriminatory intent," one must allege that the action is done "'at least in part because of, not merely in spite of, [the] adverse effects'" (quoting *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)) (cleaned up)).

The plaintiffs in *Arlington Heights*—a housing developer and affected individuals—asked the Village of Arlington Heights to re-zone an area from single-family to multi-family, with the plan to build townhouse units for low- and moderate-income tenants.  429 U.S. at 254.  The Village denied the request, and plaintiffs sued.  The district court granted judgment for the Village after a bench trial, but the Seventh Circuit reversed, finding that the impact of the Village's denial was racially discriminatory.  *Id.*

The Supreme Court granted certiorari, applied the factors to determine whether the Village's denial was motivated by an "invidious discriminatory purpose," and agreed with the district court that the complainants there had not met their burden.  *Id.* at 270-71. Though the "impact of the Village's decision d[id] arguably bear more heavily on racial minorities," there was "little about the sequence of the events leading up to the [zoning] decision that would spark suspicion," and the zoning factors used by the commission were not novel.  *Id.* at 269-70.  The Court credited the district court's finding that, while some of the opponents to the development that spoke at hearings might have been motivated by opposition to minority groups, that evidence did not warrant the conclusion that this input motivated the zoning commission in its decision.  *Id.* at 268.

The *Arlington Heights* analysis has since been applied by both appellate and district courts to other domestic government actions.  In *Veasey*, the Fifth Circuit sitting en banc applied the *Arlington Heights* factors and remanded a district court's decision holding a Texas voting law unconstitutional.  The Fifth Circuit recognized that the historical background of the challenged government action or statute is relevant, but "'unless historical evidence is reasonably contemporaneous with the challenged decision, it has

11

little probative value.'"  *Veasey*, 830 F.3d at 232 (quoting *McCleskey v. Kemp*, 481 U.S. 279, 298 n.20 (1987)).  Thus, "the most relevant 'historical' evidence is relatively recent history, not long-past history."  *Id.*  The Fifth Circuit cautioned against relying on post-enactment statements by the bill's opponents, while also acknowledging that the "legislative irregularities" involved in the bill's passage and the state's shifting justifications for the law were probative.  *Id.* at 234, 238-241.  The Fifth Circuit ultimately determined that the district court relied too heavily on "infirm evidence"—stale historical background and opponent statements—and remanded for further proceedings.

Most recently, some district courts have applied *Arlington Heights* to claims similar to Hernandez-Lopez's and have rejected those claims (several of these courts have also reviewed for rational basis).  In *United States v. Suquilanda*, 2021 WL 4895956, *5 (S.D.N.Y. Oct. 20, 2021), the district court applied the more stringent *Arlington Heights* framework for the sake of argument and determined that the defendant had not met his burden because the evidence of racial animus and discriminatory intent he relied on occurred decades before in "a precursor [statute] to the modern-day Section 1326."  The court cited with approval *United States v. Gallegos-Aparicio*, 2020 WL 7318124, **3-4 (S.D. Cal. Dec. 11, 2020), which specifically noted that the legislative history on the 1990 amendment to Section 1326 was void of any evidence of discriminatory intent.  The courts in both *Gallegos-Aparicio* and *Suquilanda* concluded that 8 U.S.C. § 1326 was enacted without discriminatory intent and denied defendants' motions to dismiss their indictments. *Id.* at **3-4; *Suquilanda*, 2021 WL 4895956 at *5.

In *Novondo-Ceballos*, the district court first determined that rational basis review was appropriate, but also addressed and rejected defendant's arguments under *Arlington Heights*. 2021 WL 3570229. In doing so, the court found that "there is no disparate impact on Latino individuals under the second prong of the *Arlington Heights* analysis." *Id.* at \*4. The court explained that "even though a higher percentage of individuals of Latinx origin are prosecuted for § 1326 violations, it does not automatically follow that they are disparately impacted." *Id.* Factors other than race, including geographic proximity of heavily Latinx populations to the United States and the "political and financial realities unique to Central America," explain the disparate impact criminal immigration statutes may have. *Id.* (citing cases); *Rollerson*, 6 F.4th at 640 (the *Arlington Heights* framework is limited when a government action is largely based on geographical constraints).

Hernandez-Lopez relies heavily on *United States v. Carillo-Lopez*, 2021 WL 3667330 (D. Nev. Aug. 18, 2021), an opinion which has gently been labeled "somewhat of an outlier." *Suquilanda*, 2021 WL 4895956, at \*5. There, the district court applied *Arlington Heights* and found § 1326 unconstitutional. The court began its analysis not by looking to § 1326 or at its more recent amendments), but by focusing on a 1929 predecessor statute.[3] 2021 WL 3667330 at \*\*9-11. Some legislators speaking in favor of immigration

---

[3] In fact, there are multiple "predecessor" statutes. In 1917 and 1918, Congress passed two other reentry statutes targeting anarchists and prostitutes, each with differing penalties. *Mendoza-Lopez*, 481 U.S. at 835 ("Before § 1326 was enacted, three statutory sections imposed criminal penalties upon aliens who reentered the country after deportation."). Section 1326 created a single, more equitable statute that applied the same penalty for illegal reentry to all violators: "The provisions relating to reentry after deportation should be carried forward in one section and apply to any alien deported for any reason and provide for the same penalty." S. Rep. No. 81-1515 at 656 (1950).

legislation in the run up to the 1929 statute made racist remarks, and the court relied on those remarks and other evidence in determining that the 1929 law was motivated by racial animus. *Id.* The Nevada district court concluded that the animus carried over to the 1952 legislation and subsequent amendments to that legislation. But that conclusion differs from the decisions of every other court to consider the history. *Compare id.* at *5 with *Gallegos-Aparicio*, 2020 WL 7318124 at *3 (explaining that the 1929 act is relevant but "because this historical background is remote in time to the Immigration Act of 1990, its probative value as to the motivations of the 101st Congress is limited"), *United States v. Machic-Xiap*, 2021 WL 3362738, **12-14 (D. Oregon Aug. 3, 2021) (determining that the 1929 act was racially motivated but holding that the motivation did not carry over to the 1952 statute); *United States v. Wence*, 2021 WL 2463567, **6-9 (June 16, 2021) (similar). For the reasons explained below, the Nevada district court's conclusion is wrong.

i.     **The legislative history—starting in 1952 and continuing through more recent amendments—demonstrates that 8 U.S.C. § 1326 was not motivated by a racially discriminatory purpose.**

To the extent this Court applies the *Arlington Heights* framework, when it addresses the legislative history of § 1326, it should start with the most recent amendment, or at the latest with the first enactment of the statute in 1952; it should not start with legislation from 1929. *Wence*, 2021 WL 2463567 at *5 (while historical circumstances are relevant, "the Court must seek to discern the intent of the Congress that enacted that charged provision, rather than the intent of previous Congresses"); *Abbott v. Perez*, 138 S. Ct. 2305, 2325 (2018) ("It is the intent of the 2013 Legislature" not the 2011 legislature, that matters).

In *Abbott v. Perez*, the Supreme Court confirmed that the focus should be on the enactment of the challenged law, not an earlier version. There, plaintiffs challenged a 2011 redistricting plan. 138 S. Ct. at 2315. That plan was tied up in litigation and never implemented, so Texas adopted a second plan in 2013—that too was challenged. *See id.* at 2317. The district court that found the 2011 plan invalid in part due to legislative discriminatory intent "attributed this same intent to the 2013 legislature because it had failed to 'engage in a deliberative process to ensure that the 2013 plans cured any taint from the 2011 plans.'" *Id.* at 2318 (quoting 274 F. Supp. 3d 624, 757 (2017)).

The Supreme Court reversed, emphasizing that the burden is on the challenger to prove that a state law was enacted with discriminatory intent, not the other way around, and "the good faith of the state legislature must be presumed." *Id.* at 2324 (internal quotation omitted). The Court explained:

> The allocation of the burden of proof and the presumption of legislative good faith are not changed by a finding of past discrimination. "Past discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful." The "ultimate question remains whether a discriminatory intent has been proven in a given case." The "historical background" of a legislative enactment is "one evidentiary source" relevant to the question of intent. But we have never suggested that past discrimination flips the evidentiary burden on its head.

*Id.* at 2324-25 (quoting *Mobile v. Bolden*, 446 U.S. 55, 74 (1980) (plurality opinion) and *Arlington Heights*, 429 U.S. at 267). Because the focus must be on the enacted law, the district court erred: "Instead of holding the plaintiffs to their burden of overcoming the presumption of good faith and proving discriminatory intent, it reversed the burden of proof." *Id.* at 2325. Reversal was therefore warranted.

Like *Abbott's* focus on the 2013 plan, the focus here should be on the comprehensive INA of 1952—the challenged law—and its amendments.  As multiple courts have held, the comprehensive immigration legislation passed in 1952 was not motivated by racial animus, and the legislative history of more recent amendments is devoid of racist remarks or intent.  *E.g., Wence,* 2021 WL 2463567, at **7-9 ("The Court concludes that the legislative history for the 1952 and 1990 legislation does not reveal any discriminatory motive and provides no support for Wence's position."); *Suquilanda*, 2021 WL 4895956 at *5 (similar).  As *Wence* explains, supporters of the 1952 legislation praised it for "remov[ing] racial barriers to immigration and naturalization."  Wence, 2021 WL 2463567, at *7 (quoting remarks of Congressman Walter in 82 Cong. Rec. 8215 (June 26, 1952)). *Wence* notes that "[t]he 1952 Act was not without its issues," but "many of [the remaining] inequities were later removed through subsequent alterations."  *Id.* at *8.

The 1988 amendments included the addition of 8 U.S.C. § 1326(b)(1), the specific penalty provision with which Hernandez-Lopez is charged.  The addition of (b)(1) evinced Congress's view "that illegally reentering the United States after being deported following conviction on another crime is a more serious offense than simply illegally reentering the United States, and that conduct should be deterred."  *United States v. Osorio*, 995 F.3d 801, 808 (11th Cir. 2021).  Hernandez-Lopez has provided no evidence that the 1988 Congress was motivated by a discriminatory purpose when it passed these amendments.

There is also no evidence that the Immigration Act of 1990 exhibits racial animus.

Supporters of that legislation emphasized that

> As to the exclusion of undocumented individuals, … the changes the legislation brought about would "not disturb the basic reasons for which we have always, and will always, exclude aliens: For cases where aliens have criminal records, when they are public health risks, when they violate drug laws, when they are likely to become economic burdens on the country, or when they have previously violated U.S. Immigration laws.

*Wence*, 2021 WL 2463567 at *8 (quoting Congressman Fish in 136 Cong. Rec. 36844 (Oct. 27, 1990)).   The district court in *Wence* reasoned that Congressman Fish's and other "proclamations indicate thoughtful, non-racially motivated public policy considerations for the passed legislation." *Id.*   Thus, it found that the *Arlington Heights* factor inquiring into legislative history weighed against finding that the statute violated equal protection principles. *Id.*   With the same evidence here, the same conclusion is warranted: Hernandez-Lopez has not met his burden to show that the Congress that enacted the facially neutral 8 U.S.C. § 1326—either originally in 1952 or in more recent amendments made in the 1980s and 1990s—acted with discriminatory intent.

### ii.    The historical background identified by Hernandez-Lopez carries little weight under *Arlington Heights*.

Despite the 1952 enactment and later amendments to 8 U.S.C. § 1326, Hernandez-Lopez focuses almost exclusively on legislators' remarks made in 1929, arguing that it is these remarks that actually represent the legislative intent behind § 1326.  *E.g.,* Dkt. No. 15 at 8-17.   But the remarks are more properly considered under the "historical background" *Arlington Heights* factor, not as legislative intent.

17

As an initial matter, they should be considered for what they are: remarks made by individuals, not an entire governing body.   After all, the Supreme Court has cautioned against relying too heavily on the remarks of "a handful of Congressmen":

> It is entirely a different matter when we are asked to void a statute that is, under well-settled criteria, constitutional on its face, on the basis of what fewer than a handful of Congressmen said about it.   What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high to eschew guesswork.   We decline to void essentially on the ground that it is unwise legislation which Congress had the undoubted power to enact and which could be reenacted in its exact form if the same or another legislator made a 'wiser' speech about it.

*United States v. O'Brien*, 391 U.S. 367, 384 (1968).   Thus, even if remarks by certain individuals in 1929 are considered relevant, their import should be tempered by the fact that they are not representative of the entire legislative body of the 1929 Congress.

Moreover, and to the extent statements by some congressmen can be imputed to the legislative body as a whole, the relevance of the 1929 statements is further diminished by time and identity of the speakers.   Legislative intent is not an artifact that "carr[ies] over" from one law to the next.   *City of Mobile v. Bolden*, 446 U.S. 55, 74 (1980) (plurality opinion).   Historical legislative background is most relevant when it is recent and "where there are contemporary statements by members of the decision making body."   *Arlington Heights*, 429 U.S. at 268; *see McCleskey*, 481 U.S. at 298 n.20 ("unless historical evidence is reasonably contemporaneous with the challenged decision, it has little probative value").   The remarks flagged by Hernandez-Lopez were made more than two decades before the enactment of § 1326.   And even if they were more recent, they still must be considered with caution; without more, it is inappropriate to presume that invidious intent behind one

18

statute "necessarily carrie[s] over to and infect[s]" a later statute. *Veasey v. Abbott*, 888 F.3d 792, 801 (5th Cir. 2018) (addressing two enactments six years apart).

The statements Hernandez-Lopez highlights are neither contemporary nor close in time to the 1952 enactment of 8 U.S.C. § 1326. And they were made by members of the 1929 Congress who had, in large part, retired, died, or moved to other positions by 1952.[4] Given that the statements were made over two decades prior by persons not part of the 1952 Congress, they carry little weight under the "historical background" *Arlington Heights* factor. *McCleskey*, 481 U.S. at 298 n.20; *Brnovich v. Democratic National Committee*, 141 S. Ct. 2321, 2349 n.22 (2021) (endorsing a district court's finding that evidence of discriminatory intent by an earlier legislature "had less probative value for inferring the purpose behind [the challenged action] because the bills were passed during different legislative sessions by a substantially different composition of legislators" (internal quotation marks and citation omitted)).

Hernandez-Lopez suggests that—regardless of the passage of time or the identity of the speakers—prior legislative intent is binding absent an affirmative disclaimer. Dkt. No. 15 at 19-21. But the fact that later Congresses did not expressly disclaim the remarks made by legislators and others during the debate and passage of the 1929 Act should be of no moment. Many "courts have rejected the notion that prior congressional intent remains operative until a future Congress makes an affirmative contrary showing." *Novondo-*

---

[4] By 1952, Congressmen Albert Johnson, Patrick O'Sullivan, Robert Green, and John Schafer were out of Congress; Congressmen Coleman Blease, John Box, and Harry Laughlin had died. James Davis, the Secretary of Labor from 1921 to 1930, died in 1947.

*Ceballos,* 2021 WL 3570229 at *5 (citing cases); *see also, e.g., Wence*, 2021 WL 2463567 at *9; *Cotton v. Fordice*, 157 F.3d 388, 392 (5ᵗʰ Cir. 1998) (though purpose of original statute was to discriminate based on race, challenger had "offered no such proof regarding the current version" of the same; the Court thus upheld the statute without requiring express disclaimer of past discriminatory intent); *North Carolina State Conference of the NAACP v. Raymond*, 981 F.3d 295 (4ᵗʰ Cir. 2020) (in "requiring the General Assembly to purge the taint of the prior law, the district court flipped the burden and disregarded *Abbott*'s presumption" (referencing *Abbott v. Perez*)). The good faith "presumption of legislative intent is not changed by a finding of past discrimination." *Abbott*, 138 S. Ct. at 2324. To the extent this Court finds that the 1929 Congress acted with a discriminatory purpose, that is insufficient to invalidate the law—more is required.

Hernandez-Lopez has not demonstrated more. He discusses the ongoing debate over immigration between 1924 and 1929, Dkt. No. 15 at 8-16, but this is not the "specific sequence of events leading to the challenged action." The "challenged action" is, at the very oldest, the 1952 enactment of 8 U.S.C. § 1326. Hernandez-Lopez emphasizes that the 1952 illegal reentry law "was nearly identical to the original problematic version with the exception of a broader enforcement provision." Dkt. No. 15 at 20. He also highlights that racism towards Latinx individuals persisted throughout the 1930s, 1940s, and 1950s, though the cases he cites are unrelated to immigration. Dkt. No. 15 at 29-33. That racism existed during this period is undeniable, but it doesn't doom the statute at issue: § 1326 was part of a comprehensive immigration framework that *removed* racial distinctions and inequities from the prior piecemeal framework. *Wence*, 2021 WL 2463567 at **7-8.

Hernandez-Lopez argues that the 1952 Congress should have taken the opportunity to expressly disavow the racist statements made in 1929, and that failure to do so demonstrates adoption of those views.  Dkt. No. 15 at 21-22.  As discussed above, this argument is flawed and has been repeatedly rejected by courts at all levels.

Hernandez-Lopez cites *Ramos v. Louisiana*, 140 S. Ct. 1390 (2020), and *Espinoza v. Montana Dep't of Revenue*, 140 S. Ct. 2246 (2020), to support his argument that it is appropriate to consult the legislative history of a predecessor law in assessing the constitutionality of a now-existing law.  Dkt. No. 15 at XX.  That reliance is misplaced. *Ramos* considered whether a state law allowing non-unanimous jury verdicts in criminal trials was constitutional.  *Ramos*, 140 S. Ct. at 1392.  The Court concluded it was not because the Sixth Amendment right to a jury trial "requires a unanimous verdict to convict a defendant of a serious offense."  *Id.* at 1394.  While it is true that the Court noted that laws requiring non-unanimous verdicts in criminal cases carried a racist history, the Court's holding was not that such laws are unconstitutional due to that history, but rather that the Sixth Amendment demands unanimity in criminal trials.  *See id.* at 1397 ("There can be no question either that the Sixth Amendment's unanimity requirement applies to state and federal criminal trials equally.").  *Ramos* was not an equal protection case and neither applied nor cited *Arlington Heights. Id.* at 1410 ("Ramos does not bring an equal protection challenge.") (Sotomayor, J., concurring).  In fact, in explaining its acknowledgement of the racist history of non-unanimous jury laws, the Court stated that it did so as part of the "functional" analysis required by the Sixth Amendment.  *Id.* at 1401, n.44.  *Ramos* provides no support for the defendant's attempt to invalidate § 1326.

21

Neither does *Espinoza*.  There, the Court considered whether application of a "no-aid" provision in a state scholarship program violated the Free Exercise Clause of the First Amendment.  140 S. Ct. at 2254.  The Court determined it did because the provision "plainly exclude[d] schools from government aid solely because of religious status.  *Id.* at 2255.  Notably, the Court did not rule on equal protection grounds.  *Id.* at 2263, n.5.  And the provision was not found unconstitutional because of a "checkered tradition"—that phrase appears in the opinion in response to the argument that a tradition arose in the second half of the 19th century against state support of religious schools.  *See id.* at 2258.  The Court dismissed that "tradition" as illuminating the historical background of the Free Exercise Clause.  *Id.* at 2259 ("The no-aid provisions of the 19th century hardly evince a tradition that should inform our understanding of the Free Exercise Clause.").  *Espinoza* certainly does not stand for the proposition "that not only do courts examine the racial motivations of a law at the time of its passage, later reenactments do not cleanse the law of its original taint," as Hernandez-Lopez contends.  Dkt. No. 15 at 19.

Hernandez-Lopez also emphasizes President Truman's veto and a separate bill that was enacted by the same Congress: S. 1851, the so-called "wetback" bill.  Dkt. No. 15 at 23-28.  First, President Truman was of course not a member of Congress and his objections were to the quotas in the INA; he did not address the illegal reentry provisions.  *Machac-Xiap*, 2021 WL 3362738, at *13 (the veto statement says "nothing about what President Truman thought about § 1326 specifically").  And to the extent President Truman's statements were echoing the concerns of the INA's congressional opponents, those

opponents did not take issue with Section 1326.[5]  Thus, his statements do not support the conclusion that "racial animus motivated Congress to enact § 1326." *Id.*

Second, Hernandez-Lopez's emphasis on a separate bill, S. 1851, does not advance his argument.  The history behind S. 1851 is more complex than Hernandez-Lopez indicates.  It was the product of competing interests surrounding President Truman's renegotiation of the Bracero Program with Mexico, a program that addressed the issue of migratory labor.  Its passage was supported by President Truman, and several supporters agreed that it was aimed at those who exploit illegal immigrants.  82 Cong. Rec. 1346-47 (1952) (Statements of Representatives Walter and Celler).  And in its final form, it struck a compromise between international and domestic interests.  The one district court that has found Section 1326 unconstitutional emphasizes the bill's offensive nickname, *Carillo-Lopez*, 2021 WL 3667330, at *14, but the history behind the bill demonstrates not racial animus, but instead Congress's ongoing legitimate interest in supporting legal immigration and discouraging illegal immigration.

---

[5] The congressional debate at the time centered on national-origin quotas, not illegal reentry penalties.  For example, the competing Senate bill proposed by the INA's opponents—who criticized the national-origin quotas as xenophobic, *see, e.g.,* 98 Cong. Rec. 5169, 5768 (1952) (Sen. Lehman)—contained an illegal reentry law identical to what became Section 1326.  *See* S. 2842, § 276, 82d Cong., 2d Sess. (Mar. 12, 1952); *see also United States v. Ortiz-Martinez*, 557 F.2d 214, 216 (9th Cir. 1977) ("An exhaustive reading of the congressional debate indicates that Congress was deeply concerned with many facets of the [INA], but §§ 1325 and 1326 were not among the debated sections.").  In any event, statements of a bill's opponents are to be considered with caution.  *See Shell Oil Co. v. Iowa Dep't of Revenue*, 488 U.S. 19, 29 (1988) ("This Court does not usually accord much weight to the statements of a bill's opponents"); *NLRB v. Fruit & Vegetable Packers, Local 760*, 377 U.S. 58, 66 (1964) ("We have often cautioned against the danger, when interpreting a statute, of reliance upon the views of its legislative opponents. In their zeal to defeat a bill, they understandably tend to overstate its reach.").

In sum, the "historical background" of Section 1326 is complex and motivated not by racism, but rather by a legitimate government interest in regulating immigration. The offensive remarks made by some legislators over two decades before the passage of Section 1326 and evidence of racism in unrelated contexts should carry little weight under this *Arlington Heights* factor. The Court should view this information with caution.

### iii. The remaining *Arlington Heights* factors—impact of the law, procedural departures, and substantive departures—do not support a finding that the passage of § 1326 was motivated by racially discriminatory intent.

The remaining *Arlington Heights* factors further weigh against invalidating 8 U.S.C. § 1326. As addressed above, to the extent the Court finds that the law has a disparate impact on Latinx people, "the disparate impact alone … is not pronounced enough to give rise to an inference of discriminatory motive, given the disparity is explainable on grounds other than race." *Wence*, 2021 WL 2463567, at *10; *Novondo-Ceballos*, 2021 WL 3570229, at *5. That is, it is geography, not discrimination, that accounts for the fact that the majority of persons prosecuted for illegal reentry are Latinx. Ninety-nine percent of Customs and Border Patrol "encounters" occur at the southern border, between the United States and Mexico—the northernmost country in Latin America. Thus, it should come as no surprise that a majority of Latinx persons are involved in these encounters. "Were this fact sufficient to state a claim, virtually any generally applicable immigration policy could be challenged on equal protection grounds." *Dept. of Homeland Security v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1915 (2020) (rejecting an Equal Protection challenge

24

to the recission of Deferred Action for Childhood Arrivals). The statistics cited by Hernandez-Lopez simply do not carry the day.

Hernandez-Lopez also has not shown that there were "procedural" and/or "substantive" departures supporting his claim that § 1326 violates equal protection principles.  In arguing that there were irregularities, he again focuses on the 1920s, but as discussed above, that is not the correct timeframe.  And even if it were, he has not shown "irregularities."  He emphasizes racist statements made by legislators, *e.g.* Dkt. No. 15 at 17, but they were not made in clandestine meetings or special legislative sessions—they were made during the normal course of public debate over a bill.  While the statements are abhorrent, there is nothing irregular about the proceedings in which they were made.

Hernandez-Lopez suggests that the "substantive conclusions" supporting § 1326 are a departure from the norm because "the 1920s was the first and only era in which Congress openly relied on the now-discredited theory of eugenics to enact immigration legislation." Dkt. No. 15 at 16.  He provides no evidence and cites no case holding that such reliance qualifies as a substantive departure.  Thus, while it may be rightly criticized, without more it cannot be classified as a substantive irregularity under *Arlington Heights.*

**B.    Though racial discrimination did not motivate the passage of 8 U.S.C. § 1326, the law would have been enacted even if discrimination had been a motivating factor**

Hernandez-Lopez has not shown that racial discrimination was a motivating factor for the enactment of § 1326.  But even if he had, the analysis does not end there.  "The challengers [to the government action or statute] bear the burden to show that racial discrimination was a 'substantial or motivating factor behind the enactment of the law;'"

if they do, "the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor." *Veasey v. Abbott*, 830 F.3d at 231.

Hernandez-Lopez has not met his burden, but even if he had, his challenge would still fail because § 1326 would have been enacted without racial discrimination as a motivating factor. First, the obviously valid federal immigration objectives served by an illegal-reentry law indicate that Section 1326 would have been enacted absent discriminatory intent. *See Feeney*, 442 U.S. at 275 (recognizing that, "notwithstanding [disparate] impact[, ]the legitimate noninvidious purpose of a law cannot be missed"). Imposing a sanction on those who repeatedly violate U.S. immigration laws and the country's territorial boundaries is a basic feature of a controlled border, and as explained above, Congress has a legitimate interest in border control. If the Court is to consider the rationales of the 1929 predecessor law, it should consider the legitimate, non-discriminatory rationales offered. *See* S. Rep. No. 70-1456 at 1-2 (stating it is "academic that no prohibitive law can successfully be enforced without a deterrent penalty").

The need for a deterrent penalty in 1929 would have been especially obvious given the political climate at the time and following the enactment of the 1929 legislation. Mexico was concerned over the high level of illegal immigration, and was willing to extend existing labor agreements only if the United States strengthened its laws against harboring and transporting non-citizens. *See* Cong. Rec. 795 (Sen. Ellender). It is implausible to conclude that Congress, faced with this landscape, would have forgone an illegal reentry law and accepted a return to the situation described in the 1929 Senate Report—or that it would have insisted on passing the law solely based on a desire to discriminate.

Second, and more importantly, while Hernandez-Lopez focuses heavily on the legislative history of the 1929 predecessor statute, and somewhat on the history of the 1952 INA, he does not address the many amendments since 1952. Under the *Arlington Heights* burden-shifting framework, the Court need not speculate whether the law would have been enacted without discriminatory motivation; it *was* enacted, several times over, since 1952. With many of these re-enactments and amendments, Congress sought to make the law more even-handed, with uniform penalties for all who illegally reenter the United States. The legislative history surrounding these amendments lacks evidence of racial animus.[6] The law therefore would have—and in fact has been—"enacted without this factor." *Id.*

For these reasons, even if this Court applies *Arlington Heights* instead of rational basis review, it should still reject the defendant's Equal Protection challenge.

## CONCLUSION

The Defendant's Motion to Dismiss the Indictment should be denied because 8 U.S.C. § 1326 was enacted for and furthers legitimate government interests and therefore is constitutional under rational basis review. It is also constitutional when analyzed using

---

[6] The Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978, is illustrative of Congress's efforts to increase Section 1326's deterrent value in legislation that lacks any hint of racial animus. That Act authorized greater fines for Section 1326 violations, *id.* at § 543, 104 Stat. 5059, a measure that the expert in *Carillo-Lopez* acknowledged served a valid deterrent purpose. Yet in the same Act, Congress more than doubled the then-existing cap on immigration, granted Temporary Protected Status to citizens of El Salvador fleeing that country's civil war, and created a diversity visa program to increase the number of visas provided to countries that were underrepresented in admission to the United States. Pub. L. No. 101-649, §§ 131, 303, 103 Stat. 4997-99, 5036-37. That Section 1326 was amended as part of legislation that marks "an about face away from the racist trope that accompanied" earlier immigration laws, *Gallegos-Aparicio*, 2020 WL 7318124 at *3, confirms that Congress viewed the statute as an important deterrence measure separate and apart from any discriminatory motive.

the *Arlington Heights* framework because it was enacted using standard procedures and without discriminatory intent, both originally in 1952 and more recently with amendments in the 1980s and 1990s.  The statute thus does not violate Equal Protection principles and is constitutional.  Defendant's motion should be denied.

Respectfully submitted,

JENNIFER B. LOWERY
Acting United States Attorney

*/s/ Charmaine Aarons Holder*
CHARMAINE AARONS HOLDER
Assistant United States Attorney
Texas Bar No. 00785100
AUDREY MANESS
Assistant United States Attorney
Texas Bar No. 24060219
1000 Louisiana Street, Suite 2300
Houston, TX 77002
(713) 567-9000

## CERTIFICATE OF SERVICE

This Response to Defendant's Motion to Dismiss was ECF filed with the United States District Court for the Southern District of Texas, and a copy provided to defendant's counsel of record on this 17th day of December, 2021.

*/s/ Charmaine Aarons Holder*
CHARMAINE AARONS HOLDER
Assistant United States Attorney