United States District Court
Southern District of Texas
**ENTERED**
February 02, 2022
Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | CRIMINAL NO. H-21-440 |
| V. | § | |
| | § | |
| | § | |
| JUAN ANTONIO HERNANDEZ-LOPEZ, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

Juan Antonio Hernandez-Lopez, a native and citizen of El Salvador, is charged under 8 U.S.C. § 1326(a) with illegal reentry after removal. He was found in the United States after driving while intoxicated, on March 16, 2020. He was previously deported from the United States in 2008. Hernandez-Lopez moves to dismiss the indictment based on the Equal Protection guarantee of the Fifth Amendment. (Docket Entry No. 15). Hernandez-Lopez argues that 8 U.S.C. § 1326 violates the Equal Protection Clause because the statute was enacted with a discriminatory purpose and has a disparate impact on people from Mexico and Central America. The court held argument on the motion. Based on the thorough briefs and arguments from the parties, the record, and the applicable law, the court joins the other district courts that have rejected the same argument, and disagrees with the one court that has granted a motion to dismiss based on this argument. The court denies the motion. (Docket Entry No. 15). The reasons are stated below.

**I.     Background**

"[T]he Due Process Clause of the Fifth Amendment contains an equal protection component prohibiting the United States from invidiously discriminating between individuals or groups." *Washington v. Davis*, 426 U.S. 229, 239 (1976) (citing *Bolling v. Sharpe*, 347 U.S. 497 (1954)). Criminal defendants, regardless of immigration status, are entitled to due process under

the Fifth Amendment. *United States v. Mendoza-Lopez*, 481 U.S. 828, 837 (1987) ("If [§ 1326] envisions that a court may impose a criminal penalty for reentry after *any* deportation, regardless of how violative of the rights of the alien the deportation proceeding may have been, the statute does not comport with the constitutional requirement of due process."); *Wong Wing v. United States*, 163 U.S. 228, 238 (1896) ("[E]ven aliens shall not be held to answer for a capital or other infamous crime, unless on a presentment or indictment of a grand jury, nor be deprived of life, liberty, or property without due process of law.").

An equal protection violation need not appear on the face of the statute. The challenger may show that the law was enacted with an "invidious discriminatory purpose [that] may often be inferred from the totality of the relevant facts." *Davis*, 426 U.S. at 241–42. Even if a decision is motivated in part by a racially discriminatory purpose, the law may still be valid if the government can establish that "the same decision would have resulted even had the impermissible purpose not been considered." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 271 (1977). Both the challenger and, if necessary, the government satisfy their respective burdens by a preponderance of the evidence. *Hunter v. Underwood*, 471 U.S. 222, 225 (1985). Absent proof of a discriminatory purpose, courts apply rational basis review. *See Arlington Heights*, 429 U.S. at 265–66.

Hernandez-Lopez argues that § 1326 violates equal protection because the statue was enacted with racial animus and discriminatory intent. The government first responds that rational basis review applies because the statute is an immigration law and the differential treatment of those who lawfully enter the country and those who unlawfully enter is rational. The government also argues that even if rational basis review does not apply, the record does not show that § 1326(a) was reenacted with a discriminatory purpose in 1952, or when it was amended after that.

The government also argues that the court should focus on the congressional intent in enacting § 1326(b)(1), which was not added until 1988.

Based on Hernandez-Lopez's evidence of Congress's intent in 1952 and in 1988, the court finds that the history, while shameful, does not require dismissal of this indictment. The reasons are stated below.

II.   Analysis

   A.   The Case Law

No circuit court has yet addressed this issue, but several district courts have addressed the same motion and arguments. All have acknowledged the racial animus behind the 1929 law, but all but one court has declined to dismiss on that basis. *Compare e.g.*, *United States v. Novondo-Ceballos*, No. 21-CR-383 RB, 2021 WL 3570229 (D.N.M. Aug. 12, 2021) (denying motion); *United States v. Ruiz-Rivera*, No. 3:20-MJ-20306-AHG, 2020 WL 5230519 (S.D. Cal. Sept. 2, 2020) (denying motion); *United States v. Rios-Montano*, No. 19-CR-2123-GPC, 2020 WL 7226441, at *8 (S.D. Cal. Dec. 8, 2020) (denying motion); *United States v. Gutierrez-Barba*, No. CR1901224001PHXDJH, 2021 WL 2138801, at *5 (D. Ariz. May 25, 2021), *and United States v. Carrillo-Lopez*, No. 320CR00026MMDWGC, 2021 WL 3667330, at *1 (D. Nev. Aug. 18, 2021).

District courts in the Fifth Circuit have rejected these arguments. *United States v. Barcenas-Rumualdo*, No. 3:20-cr-1849 (W.D. Tex. May 7, 2021); *Ortiz-Beltran v. United States*, No. 7:21-cv-325 (S.D. Tex. Jan. 5, 2022) (Report and Recommendation to Deny Defendant's § 2255 Motion). The district courts that have addressed this issue differ as to whether this statute, as a criminal immigration law, is reviewed under the *Arlington Heights* framework or under rational basis only. *Compare, e.g.*, *Rios-Montano*, 2020 WL 7226441, at *2 (applying *Arlington Heights* because "[a] criminal immigration statute passed by Congress is not insulated from

3

scrutiny because the defendant seeks to prove the equal protection violation through a racially discriminatory Congressional motive rather than a facial classification on the basis of race"), *and Gutierrez-Barba*, 2021 WL 2138801, at *2 ("[W]here federal interests predominate, as in the immigration area, judicial scrutiny is relaxed to a "rational basis" standard.").

The court begins the analysis here with the more stringent *Arlington Heights* standard.

**B.     Congressional Intent under *Arlington Heights***

*Arlington Heights* requires Hernandez-Lopez to show both (1) that the official government decision (the statute, in this case) results in a racially disproportionate impact and (2) that it was motivated by a racially discriminatory intent or purpose.  429 U.S. at 264–65 ("[O]fficial action will not be held unconstitutional solely because it results in a racially disproportionate impact. . . . Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause.").  Under *Arlington Heights*, to determine whether a decision was made with a discriminatory purpose, courts consider: "(1) the historical background of the decision, (2) the specific sequence of events leading up to the decision, (3) departures from the normal procedural sequence, (4) substantive departures, and (5) legislative history, especially where there are contemporary statements by members of the decision-making body." *Veasey v. Abbott*, 830 F.3d 216, 230–31 (5th Cir. 2016) (quoting *Overton v. City of Austin*, 871 F.2d 529, 540 (5th Cir. 1989)).

Hernandez-Lopez does not need to show that the statute was solely motivated by racism, because "[r]arely can it be said that a legislature or administrative body operating under a broad mandate made a decision motivated solely by a single concern[.]" *Arlington Heights*, 429 U.S. at 265.  The impact of the decision "may provide an important starting point," such as when "a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even

4

when the governing legislation appears neutral on its face." *Id.* at 266. "But such cases are rare." *Id.*

The record in this case is the same as in the earlier cases, with the addition of the affidavit of Professor S. Deborah Kang, a historian. (Docket Entry No. 25, 25-1, 25-2). The record includes the legislative history for the 1929 law, President Truman's letter to Congress explaining his veto of the 1952 bill, the declaration of another historian, Dr. Kelly Lytle Hernandez, and the transcript of the evidentiary hearing in *Carrillo-Lopez*, 2021 WL 3667330, (D. Nev. Aug. 18, 2021), including testimony from Dr. Hernandez and Benjamin Gonzalez O'Brien, a political science professor.

Congress enacted the Undesirable Aliens Act in 1929, providing that "[a]ny alien who hereafter enters the United States at any time or place other than as designated by immigration officials or eludes examination or inspection by immigration officials . . . shall be guilty of a misdemeanor." Act of Mar. 4, 1929, Pub. L. No. 70-1018, § 2. The Immigration and Nationality Act of 1952 ("INA"), often referred to as the McCarran-Walter Act ("McCarran-Walter Act"), codified the unlawful reentry provision under Title 8 of the United States Code, 8 U.S.C.A. § 1326. Immigration and Nationality Act of 1952, Pub. L. No. 82-414, § 275, 66 Stat. 229. Since 1952, § 1326 has been amended five times—in 1988, 1990, 1994, and twice in 1996—to increase the penalties. *Carrillo-Lopez*, 2021 WL 3667330, at *4. The government also notes that Hernandez-Lopez is subject to the penalty provisions in § 1326(b)(1), which were included as part of the amendments in the Anti-Drug Abuse Act of 1988. Subsection (b) increased penalties for those with prior felony convictions. *See* Pub. L. 100-690, title VII § 7345(a), 102 Stat. 4471 (Nov. 18, 1988) (codified at 8 U.S.C. § 1326 (1988)). "Congress enacted and later amended § 1326(b) to increase the maximum illegal-reentry sentences for noncitizens whose previous removal occurred

after they were convicted of a felony." *United States v. Osorto*, 995 F.3d 801, 814 (11th Cir.), *cert. denied*, 142 S. Ct. 470 (2021).

Hernandez-Lopez argues that the Congressional intent behind the 1929 Undesirable Aliens Act trumps. Hernandez-Lopez relies heavily on Professor Kelly Lytle Hernandez's testimony in *Carrillo-Lopez,* and her declaration in this case, detailing the racial animus behind the 1929 Act. (Docket Entry No. 15 at 9–18, 15-2). This evidence, along with the 1929 legislative history, shows that at least some members of Congress were motivated to criminalize reentry because of their support for eugenics and opposition to the increased presence of the "Mexican race" in the United States. (Docket Entry No. 15-2 at 2–7); *United States v. Gilberto Wence*, No. 3:20-CR-0027, 2021 WL 2463567, at *5 (D.V.I. June 16, 2021). This dark history is relevant to understanding the historical backdrop behind the unlawful reentry provisions. But it is not dispositive for understanding the motivation for the unlawful reentry provision that Hernandez-Lopez is charged with committing because that provision was reenacted in 1952, and the penalty provision at issue was enacted in 1988. *See Wence*, 2021 WL 2463567, at *5 ("*Arlington Heights* directs the Court to look at the motivation behind the official action being challenged"); *Arlington Heights*, 429 U.S. at 265–67 (describing intent analysis in terms of "the challenged decision").

Hernandez-Lopez urges, relying again on *Carrillo-Lopez*, that "Congress's failure to repudiate the racial animus that led to the adoption of the original statute, coupled with contemporaneous continuing expressions of racism in 1952 demonstrated, under the totality of the circumstances, that the current law was likewise the product of racial discrimination." (Docket Entry No. 15 at 20). Hernandez-Lopez argues that the 1952 statue is nearly identical to the 1929 version, was reenacted in 1952 "with full knowledge of the disparate impact of illegal reentry on

6

Latinx migrants," but "was neither substantively changed nor debated except that it expanded the punitive reach of the statute." (Docket Entry No. 15 at 21).

The racist rhetoric continued in the debates immediately preceding the override of President Truman's veto. *See, e.g.*, 82 Cong. Rec. 8116 (June 26, 1952) ("Unless the Government takes drastic measures to stop the wetback invasion, the gates will be opened for every kind of influence that could possibly be dreamed of to permit illegal entry into the United States."). Proposed amendments to the 1952 Act included the "Wetback Amendment." 82 Cong. Rec. 8122 (June 26, 1952). However, this "Wetback Amendment" was voted down by a count of 11 "yeas" to 65 "nays." 82 Cong. Rec. 8123 (June 26, 1952). Every senator who argued for the "wetback amendment" voted against the veto override. *Wence*, 2021 WL 2463567, at *7.

Hernandez-Lopez relies on Professor Gonzalez O'Brien's testimony about the use of the racist slur "wetback" in other legislation in the early 1950s, including legislation referred to in the Congressional Record as the "Wetback Bill" that was under consideration at the same time as the 1952 Act. (Docket Entry No. 15 at 25–26). Hernandez-Lopez cites to President Truman's veto of the 1952 Act, and ongoing efforts to repatriate Mexican-Americans and exploit Mexican laborers. (Docket Entry No. 15 at 20–33). Hernandez-Lopez also relies on Professor Kang's affidavit, describing the ongoing racism motivating immigration legislation in the 1950s. (Docket Entry No. 25).

The government urges that the legislative history of the 1952 Act shows that the comprehensive immigration legislation was not motived by racial animus. The government cites to supporters' statements, including that the legislation "remov[ed] . . . racial barriers to immigration and naturalization." (Docket Entry No. 20 at 17 (quoting *Wence*, 2021 WL 2463567, at *7). Although President Truman explained that he believed the INA "perpetuate[d]" "racial or

7

national barriers to naturalization," his primary concern was about the quota system, and there is inadequate record evidence of his thoughts specifically about § 1326. (Docket Entry No. 15-12 at 2; No. 15-12); *United States v. Machic-Xiap*, No. 3:19-CR-407-SI, 2021 WL 3362738, at *8 (D. Or. Aug. 3, 2021).

Hernandez-Lopez concedes that "[t]he primary focus of the [1952] Act was the development of quotas for immigrants from various countries." (Docket Entry No. 15 at 21). As the Ninth Circuit has explained, "An exhaustive reading of the congressional debate indicates that Congress was deeply concerned with many facets of the Immigration and Nationality Act of June 27, 1952, but §§ 1325 and 1326 were not among the debated sections." *United States v. Ortiz-Martinez*, 557 F.2d 214, 216 (9th Cir. 1977) (citing 98 Cong.Rec. 4301–4321; 4399–4416; 4422–4444; 5088–5115; 5149–5181; 5209–5240; 5326–5334; 5408–5443; 5603–5631; 5756–5804; 7016–7019; 8253–8268 (1952)). In *Machic-Xiap*, "Professors Hernandez and Gonzalez-O'Brien both testified that the legislative history of the INA was largely free of explicitly racist expressions." 2021 WL 3362738, at *13. The 1952 House Report contains only this brief description of §§ 1325 and 1326:

> In addition to the foregoing, criminal sanctions are provided for entry of an alien at an improper time or place, for misrepresentation and concealment of facts, for reentry of certain deported aliens, for aiding and assisting subversive aliens to enter the United States, and for importation of aliens for immoral purposes.

*Ortiz-Martinez*, 557 F.2d at 216 (quoting 1952 U.S.Code Cong. & Admin.News p. 1724). Even Professor Kang acknowledged that "Congress remained largely silent with respect to the recodification of the criminal entry and re-entry provisions of the immigration laws in the 1952 Act." (Docket Entry No. 25-2 at 22). She concludes that animus is evidenced by Congress's failure "to examine or cleanse the anti-Mexican racism that infected the Act of March 4, 1929," and its decisions to make the entry and reentry offenses "easier to prosecute." (Docket Entry No.

8

25-2 at 22). Hernandez-Lopez points to the statement from Deputy Attorney General Peyton Ford, explaining that § 1326 would make it easier to address the "wetback problem." (Docket Entry No. 15-13 at 8). But Ford was not a member of Congress, so his use of the racial epithet does not provide evidence of Congress's intent in reenacting § 1326.

Hernandez-Lopez additionally points out that the subsequent amendments to the reentry provisions increased punishment without addressing the racist history. The government responds that the history of the later amendments is devoid of racial animus. The government relies on Congressman Fish's explanation in 1990 that the legislation would:

> not disturb the basic reasons for which we have always, and will always, exclude aliens: For cases where aliens have criminal records, when they are public health risks, when they violate drug laws, when they are likely to become economic burdens on the country, or when they have previously violated U.S. Immigration laws.

136 Cong. Rec. 36844 (Oct. 27, 1990). The court in *Wence* explained that "These proclamations indicate thoughtful, non-racially motivated public policy considerations for the passed legislation, and lead to the inescapable conclusion that [the] argument that the current 8 U.S.C. § 1326 remains tainted by the 1929 Act because 'evidence that racist motivations were jettisoned is absent from the record' finds no basis in fact or in law." 2021 WL 2463567, at *8.

As other courts have recognized, the legislative history that Hernandez-Lopez relies on shows that some members of the 1929 Congress were motivated to criminalize unlawful entry "at least in part out of a desire to maintain the supposed purity of the white race and prevent racial mixing, and intended the laws to target races they deemed undesirable." *United States v. Gallegos-Aparicio*, No. 19-CR-2637-GPC, 2020 WL 7318124, at *3 (S.D. Cal. Dec. 11, 2020); *see also* (Docket Entry No. 15-2 at 3–7). But this history is remote from the 1952 Congress, so "its probative value as to the motivations of the [later] Congress is limited." *Id.* (citing *City of Mobile,*

9

*Ala. v. Bolden*, 446 U.S. 55, 74 (1980)). And Hernandez-Lopez had not pointed to evidence of racism motivating the reenactment of § 1326, as opposed to other provisions of the 1952 Act.

Hernandez-Lopez maintains the burden of showing discriminatory intent in the enactment of the law that he is charged with violating. Proof of a discriminatory intent as to an earlier version is insufficient to show discriminatory intent as to the later version. The Supreme Court has explained that:

> [t]he allocation of the burden of proof and the presumption of legislative good faith are not changed by a finding of past discrimination. '[P]ast discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful.' The 'ultimate question remains whether a discriminatory intent has been proved in a given case. The 'historical background' of a legislative enactment is 'one evidentiary source' relevant to the question of intent. But we have never suggested that past discrimination flips the evidentiary burden on its head.

*Abbott v. Perez*, 138 S. Ct. 2305, 2324–25 (2018) (cleaned up). "[B]y amendment, a facially neutral provision . . . might overcome its odious origin." *Cotton v. Fordice*, 157 F.3d 388, 391 (5th Cir. 1998).

"[T]he vast majority of the evidence of racial animus and discriminatory intent focuses on the 1929 Undesirable Aliens Act, a precursor to the modern-day Section 1326, which was undoubtedly enacted in the face of bald racial animus towards Hispanic people," but "this evidence bears little weight on Section 1326, which was officially reenacted as a felony offense in 1952 as part of the broader Immigration and Nationality Act." *United States v. Suquilanda*, No. 21 CR 263 (VM), 2021 WL 4895956, at *5 (S.D.N.Y. Oct. 20, 2021). "Unlike previous piecemeal immigration legislation, the INA was a comprehensive immigration statute designed to 'revise the laws relating to immigration, naturalization, and nationality,'" and to respond to a "massive, nine-hundred-page report that identified problems with current U.S. immigration policy and laid out recommendations for how best to address them." *Machic-Xiap*, 2021 WL 3362738, at *7 (citing

Immigration and Nationality Act of 1952, Pub L. No. 82-414, 66 Stat. 163 (codified as amended in scattered sections of 8 U.S.C.); Jia Lynn Yang, *One Mighty and Irresistible Tide: The Epic Struggle Over American Immigration 1924-1965* 155 (2020)). As the court in *Machic-Xiap* explained, "[m]any in Congress viewed the INA as a dramatic departure from the heavily racialized immigration statutes of the early 1920s." 2021 WL 3362738, at *8.

Even with a history of racial animus towards people from Mexico and Central America, Hernandez-Lopez must show that the provision he was charged with violating was itself enacted at least in part by racial animus. He cannot merely point to the general history of racial animus in immigration policy and the absence of a refutation of this history to meet his burden. He has not cited to legislative history that shows racial animus in the enactment of § 1326(a) in 1952 or § 1326(b)(1) in 1988.

Hernandez-Lopez argues that *Ramos v. Louisiana*, 140 S. Ct. 1390 (2020), and *Espinoza v. Montana Dep't of Revenue*, 140 S. Ct. 2246 (2020), show that subsequent enactments of a statute do not erase its historical context. Neither statute at issue in *Ramos* nor *Espinoza* involved an Equal Protection challenge. In both cases, the Court acknowledged that the laws had a discriminatory history, and this inquiry is included in the *Arlington Heights* framework. The court joins the other district courts that have concluded that "*Ramos* and *Esponiza* do not hold that the discriminatory motivations of a previous legislature are determinative of the outcome of an *Arlington Heights* analysis of a law enacted by a subsequent legislature." *Rios-Montano*, 2020 WL 7226441, at *4. *See also Machic-Xiap*, 2021 WL 3362738, at *15; *United States v. Gutierrez-Barba*, 2021 WL 2138801, at *4.

Hernandez-Lopez has not shown that the 82nd Congress was motivated by a discriminatory intent when it reenacted § 1326 in 1952. The legislative history shows that § 1326 was not the

11

focus of the racist rhetoric in 1952, and that those engaging or supporting that rhetoric lost the veto override vote. Hernandez-Lopez has not pointed to any evidence that the 100th Congress was motivated by a discriminatory intent in enacting the penalty provision in § 1326(b) in 1988. The 1990 legislative history shows that the criminalization of unlawful reentry was motivated by an effort to enforce immigration laws. The court concludes that the legislative history does not reveal discriminatory intent as needed to dismiss this indictment on equal protection grounds.

### C. Disparate Impact

In the "rare case" in which the impact of an official action is sufficient to find a constitutional violation, the challenger must show that the impact was "unexplainable on grounds other than race." *See Arlington Heights*, 429 U.S. at 266. Hernandez-Lopez argues that § 1326 disparately impacts Latinx individuals from Mexico and Central America based on the "soaring" number of prosecutions for illegal reentry and because "over 97% of the persons apprehended at the border in 2000 were of Mexican descent, 86% in 2005 and 87% in 2010." (Docket Entry No. 15 at 7). The government responds that the statistics Hernandez-Lopez cites are attributed to Mexico's geographic proximity to the United States, rather racial animus. The government has provided a race-neutral explanation for the disproportionate impact of § 1326 on people from Mexico and Central America. Hernandez-Lopez has not shown that this is the rare case in which the constitutional violation is obvious from the impact of the law. As a result, even though the record shows that Latinx people are disproportionately impacted by § 1326, that does not show that Congress was at least motived in part by a discriminatory purpose.

### D. Rational Basis Review

Because Hernandez-Lopez has failed to show that 8 U.S.C. § 1326 was enacted with a discriminatory motive, the court analyzes the statute under rational basis review. The challenged

law must be upheld if it is "rationally related to a legitimate government purpose." *United States v. Ramos*, 858 F. App'x 759, 761 (5th Cir. 2021). The Court concludes that 8 U.S.C. § 1326 is rationally related to the legitimate government interests of preventing the reentry of those who have violated immigration laws in the past. This purpose was articulated in the congressional debate surrounding the 1990 reenactment of 8 U.S.C. § 1326. 136 Cong. Rec. 36844 (Oct. 27, 1990) (explaining that the immigration legislation would "not disturb the basic reasons for which we have always, and will always, exclude aliens:" including "they have previously violated U.S. Immigration laws"). Section 1326 is rationally related to a legitimate government interest and does not violate equal protection.

**III.     Conclusion**

The defendant's motion to dismiss, (Docket Entry No. 15), is denied.

SIGNED on February 2, 2022, at Houston, Texas.

_____
Lee H. Rosenthal
Chief United States District Judge